503 A.2d 1344

**MILLER BUILDING SUPPLY, INC.**

v.

**Jack F. ROSEN et al.**

**No. 51, Sept. Term, 1985.**

Court of Appeals of Maryland.

Feb. 7, 1986.

342

Joseph W. Pitterich (William H. Schladt and Pitterich & Snedegar, P.C., on brief), Chevy Chase, for appellant.

Mark J. Wishner, Washington, D.C. (David S. Greene, on brief, Rockville, for appellee.

Argued before MURPHY, C.J. and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

RODOWSKY, Judge.

In this case we revisit *H & R Block, Inc. v. Testerman,* 275 Md. 36, 338 A.2d 48 (1975) which held that in actions of tort arising out of a contract, actual malice is a necessary predicate of punitive damages. Petitioner, an employer whose disloyal employees diverted profits to themselves, contends that its fraud action is not subject to the *Testerman* rule or, if it is, that this Court should change the law to exclude fraud actions from the *Testerman* rule. We shall reject these arguments for reasons stated below.

The petitioner, and plaintiff in the Circuit Court for Montgomery County, is Miller Building Supply, Inc. (Miller). It sells kitchen appliances and cabinets at wholesale and retail. Respondents, Jack Rosen and Bernard Hollander, were employed by Miller as salesmen. The stage was set for the events leading to this litigation by the variable pricing of Miller's products. The price from Miller to a wholesale customer was approximately 40% below the listed

retail price for the same item. The listed retail prices, however, were themselves subject to negotiation. While salesmen for Miller were expected to exert their best efforts to obtain the list price in retail transactions, salesmen had the authority to sell below list in order to make the sale.

Miller did not install products sold by it, but many homeowner customers desired installation in addition to the products. Consequently Miller would, through its sales force, arrange for installation by a contractor approved by Miller. Transactions of this type, which we shall call Type I, would result in two contracts: one between the homeowner and Miller for the purchase and sale of products, and the other between the homeowner and a contractor for installation services. Miller's sales representatives, as part of the services rendered by them in conjunction with the sale of Miller's products, usually did the design or layout work for the installation, coordinated delivery and labor, and also handled customer complaints.

On the wholesale side of its business, Miller sold to builders, developers, home improvement contractors, and the like. These sales were at prices discounted from retail and known as the contractors' price. If a contractor produced a customer for a kitchen remodeling job in a home and the job called for Miller products, there would be a contract between the homeowner and the contractor which covered both supplies and services and a contract between Miller and the contractor for the sale by Miller of the products involved. We shall call this a Type II transaction.

One of the installers recommended by Miller in Type I transactions, and who purchased from Miller in Type II transactions, was David B. Kerr (Kerr) who did business as Glenn Dale Contracting (Glenn Dale). Beginning no later than 1973, the respondents and Glenn Dale entered into the following scheme, which we shall call a Type III transaction. It involved homeowner customers who desired to purchase Miller products and to have them installed and

who were willing to pay for both goods and services in an amount which exceeded the total of Glenn Dale's charge for services and Miller's price for goods at the contractors' price. In Type III transactions, the homeowner paid the total contract price to Glenn Dale from which Glenn Dale deducted, in its accounting with respondents, its cost of products purchased from Miller at the contractors' price. Glenn Dale also retained from the homeowner's contract price its compensation for installation services. The balance of the contract price paid by the homeowner to Glenn Dale was paid by Glenn Dale to the respondents, trading as Buildco Associates. Customers in a Type III transaction could have been prospects located by respondents or by Glenn Dale. Kerr estimated that 85% of the customers in the Type III transactions were produced by the respondents and 15% by him. In either event, respondents dealt with the customer in negotiating the contract between the homeowner and Glenn Dale. Kerr's charges for installation in Type III transactions did not vary depending on whether or not he had procured the customer.

From Miller's standpoint, a Type III transaction looked like a Type II transaction. Glenn Dale appeared to Miller to be a contractor who had sold a kitchen remodeling job calling for Miller equipment and who was thus entitled to the 40% discount. Until 1981, the loyal agents of Miller did not have actual knowledge that there were contracts between Glenn Dale and homeowners which in effect called for a price for equipment in excess of Miller's contractors' price and that the excess was being paid by Glenn Dale to respondents.

Miller uncovered this scheme in the latter part of 1981. Kerr cooperated in the investigation conducted by Miller and furnished copies of Internal Revenue Service Forms 1099 issued by Kerr to Buildco Associates, *i.e.*, to respondents, for each of the years 1973 through 1981. They totaled $258,612.42. Miller fired the respondents and brought this lawsuit.

The allegations in Miller's declaration were stated in three counts which the pleader parenthetically labeled "Fraud," "Civil Conspiracy," and "Breach of Fiduciary Duty." At the close of the evidence in the jury trial, respondents moved for a directed verdict as to punitive damages. They argued that since any tort the jury might find would have had to have arisen out of a contract, actual malice was required to support a claim for punitive damages and that there had been no evidence of actual malice. The trial court reserved decision (Maryland Rule 2–519(d)) and submitted punitive damages to the jury.

There were no exceptions to the court's instructions to the jury which are material to the issues now before us. The trial judge instructed the jury on each of the three theories of fraud, conspiracy, and breach of fiduciary duty. Fraud was defined in terms of the elements of an action of deceit. The explanation of compensatory damages given to the jury was applicable whether the jury found for the plaintiff on one, two, or all three of the liability theories. The jury was further instructed that there could be no award of punitive damages unless the jury found for Miller on the fraud count. The punitive damage instructions permitted such an award if the jury found implied malice.[1]

In a special verdict the jury found for Miller on each of the three counts. Because, under the instructions, compensatory damages were common to all counts, the jury made a single award of compensatory damages. They were in the

---

**1.** The instruction in relevant part stated:

   In the case of fraud or deceit, punitive damages may be awarded where the wrong involves some violation of duty springing from the relationship of trust or confidence or where the fraud is gross or the case presents extraordinary or exceptional circumstances clearly indicating a malicious [*sic*] and willfulness.

   Proof of actual malice is not necessary to justify an award of punitive damages in an action for fraud.

This instruction was patterned on *Russell v. Stoops,* 106 Md. 138, 66 A. 698 (1907) and *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 366 A.2d 7 (1976).

amount of $3,231. On the fraud count it awarded punitive damages in the amount of $150,000.

Respondents moved for a judgment n.o.v. After further considering the reserved ruling, the trial court concluded that the *Testerman* principle applied. Judgment notwithstanding the verdict was entered in favor of Miller for the compensatory damages only. Miller's motion for a new trial (Rule 2–533(a)) was denied. The Court of Special Appeals affirmed. *Miller Building Supply, Inc. v. Rosen,* 61 Md.App. 187, 485 A.2d 1023 (1985).

We granted Miller's petition for certiorari which raised the following questions, which we have renumbered.

1. Whether the verdict for punitive damages should be reinstated because the jury was properly instructed.

2. Whether the distinction between implied malice and actual malice should be abolished with respect to punitive damages in fraud cases.

3. Whether the plaintiff is entitled to a new trial where the jury specifically found a breach of fiduciary obligation, but did not award damages in conformance with the law, the court's instructions or the evidence.

## I

Miller's first point is that under present Maryland law it need not have shown actual malice, but needed only to have shown implied malice to support the award of punitive damages. Accordingly, Miller submits, the jury was correctly instructed and the punitive damage verdict should be reinstated. To find actual malice requires finding "the performance of an unlawful act, intentionally or wantonly, without legal justification or excuse but with an evil or rancorous motive influenced by hate; the purpose being to deliberately and wilfully injure the plaintiff." *Drug Fair v. Smith,* 263 Md. 341, 352, 283 A.2d 392, 398 (1971). To find implied malice, however, does not require finding that conduct has been motivated by hatred or spite. In certain torts conduct of an extraordinary or outrageous character

may be considered the legal equivalent of actual malice. For example, wanton or reckless disregard for human life in the operation of a motor vehicle, with the known dangers and risks attendant to such conduct, can be the legal equivalent of actual malice. *Smith v. Gray Concrete Pipe Co.*, 267 Md. 149, 168, 297 A.2d 721, 731 (1972).

It is the law in Maryland and the general rule elsewhere that punitive damages are not allowed for breach of contract. *See St. Paul at Chase Corp. v. Manufacturers Life Insurance Co.*, 262 Md. 192, 236, 278 A.2d 12, 33, *cert. denied*, 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971); 5 *Corbin on Contracts* § 1077 (1964); Restatement (Second) of Contracts § 355. In certain tort actions in which the tort arises wholly independently of any contract, punitive damages may be awarded based on implied malice. *See, e.g., Gray, supra.* But there is an area between pure tort and pure contract in which "the tort found its source in the contract without which the wrong would not have been committed." *Wedeman v. City Chevrolet Co.*, 278 Md. 524, 529, 366 A.2d 7, 11 (1976).

> Recognizing that torts arising out of contractual relationships exhibit characteristics of both tort and contract actions, we sought in *Testerman* to fashion a workable rule governing the recovery of punitive damages which would be more stringent than that applied in pure tort cases, but which at the same time would allow the possibility of recovery where the particular conduct clearly warranted the imposition of such damages. [*General Motors Corp. v. Piskor*, 281 Md. 627, 639, 381 A.2d 16, 23 (1977).]

Hence, *Testerman* held that "where the tort is one arising out of a contractual relationship, actual malice is a prerequisite to the recovery of punitive damages." *H & R Block, Inc. v. Testerman*, 275 Md. at 47, 338 A.2d at 54.

We need not define here the outer boundaries of "tort arising out of a contractual relationship" since in this case the employment contracts between Miller and the respon-

dents cause the latter's otherwise nontortious conduct to become fraudulent as to Miller. Perhaps the clearest applications of the *Testerman* principle occur when the plaintiff and the tortfeasor are in privity and the conduct of the tortfeasor may properly be pleaded alternatively (whether or not actually pleaded), as a breach of contract and as a tort. For example, in *Testerman*, the claim against the defendant, a tax return preparation service, could have been properly pleaded, and was pleaded, both as a breach of the contract to prepare plaintiffs' returns and as a negligent performance of the duty assumed to prepare returns.[2] Here, Miller and the respondents had a contractual relationship, and the conduct complained of as a tort is a breach of that contract.

■ Respondents, as employees, owed Miller a duty of loyalty. "It is an elementary principle that fundamental duties of an agent are loyalty to the interest of his principal and the need to avoid any conflict between that interest and his own self-interest." *Maryland Credit Finance Corp. v. Hagerty*, 216 Md. 83, 90, 139 A.2d 230, 233 (1958). Miller's Count III, claiming damages for breach of fiduciary duty,

---

**2.** Indeed, one commentator has suggested that a prerequisite to applying *Testerman* is that the plaintiff have alternative theories of recovery in tort and contract under the facts presented. *See* McCadden, *Punitive Damages in Tort Cases in Maryland*, 6 U.Balt.L.Rev. 203 (1977). This theory may not, however, explain certain cases which foreshadowed *Testerman*. That opinion relied on, *inter alia, Damazo v. Wahby*, 259 Md. 627, 270 A.2d 814 (1970) and *Knickerbocker Ice Co. v. Gardiner Dairy Co.*, 107 Md. 556, 69 A. 405 (1908). Both of these cases involved malicious interference with contractual relationships and both held that punitive damages could not be awarded absent actual malice. In *Rite Aid Corp. v. Lake Shore Investors*, 298 Md. 611, 471 A.2d 735 (1984), we reiterated the rule that actual malice is a prerequisite to punitive damages for malicious interference with a contract. *Rite Aid* cited *Knickerbocker* and *Wahby*, although it did not expressly say that the *Testerman* principle applied. In the tort of malicious interference with a contractual relationship, the plaintiff-promisee is not in privity with the interfering defendant-tortfeasor. The contract interfered with is between the plaintiff-promisee and a third-party promisor. If the actual malice requirement for punitive damages in intentional interference cases is an application of *Testerman*, then the instant case lies near the core and not the periphery of that principle.

was a claim for breach by the respondents of their duty of loyalty to Miller which was implied by law into their contracts of employment. "If an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal." Restatement (Second) of Agency § 403. "Unless otherwise agreed, an agent who makes a profit in connection with transactions conducted by him on behalf of the principal is under a duty to give such profit to the principal." Restatement (Second) of Agency § 388. *See also C-E-I-R, Inc. v. Computer Dynamics Corp.,* 229 Md. 357, 366, 183 A.2d 374, 379 (1962); *Nagel v. Todd,* 185 Md. 512, 45 A.2d 326 (1946); *De Crette v. Mohler,* 147 Md. 108, 127 A. 639 (1925); Restatement of Restitution § 197. Thus, the employment contracts created respondents' duty to act for Miller's benefit and gave rise to their liability to Miller to account for personal profits earned in violation of their duty of loyalty. Respondents were not free to take for themselves the excess over the contractors' price in the Type III transactions.

Respondents' duties and Miller's remedy under the contract theory may be compared to respondents' duties and Miller's remedy under the deceit claim. With respect to that claim, the jury was instructed on the elements of legal fraud which are set forth in *James v. Goldberg,* 256 Md. 520, 528–29, 261 A.2d 753, 758 (1970). They are:

"(1) that a representation made by a party was false; (2) that either its falsity was known to that party or the misrepresentation was made with such reckless indifference to truth to impute knowledge to him; (3) that the misrepresentation was made for the purpose of defrauding some other person; (4) that that person not only relied upon the misrepresentation but had the right to rely upon it with full belief of its truth, and that he would not have done the thing from which damage resulted if it had not been made; and (5) that that person suffered damage directly resulting from the misrepresentation."

[Quoting *Suburban Properties Management, Inc. v. Johnson*, 236 Md. 455, 460, 204 A.2d 326, 329 (1964).]

■ Miller contends that in Type III transactions respondents misrepresented that Miller was contracting with Glenn Dale when Miller should have been contracting with the homeowner customer and further misrepresented that Miller's selling price was the contractors' price when it should have been the total of the contractors' price and the amount paid to respondents. Of course, if the respondents had been employed exclusively by Glenn Dale, there would not, even arguably, have been any misrepresentation. The respondents' duty to disclose the true facts rested exclusively on the agency between respondents and Miller because the harm to Miller depended on that agency for any recognition in law. Had respondents been employees of Glenn Dale, Miller would have no basis for contending that, in effect, a Type III transaction should have been a Type I transaction. Further, even under Miller's "fraud" analysis, Miller's damages are measured by the secret profits paid to the respondents. This was not an out-of-pocket loss to Miller. Miller has a right to the profits only because respondents, under the agency principles embodied in the employment contract, were obliged to remit those profits to Miller. Miller's "deceit" claim is a tort arising out of a contractual relationship.

■ Miller's next argument why the *Testerman* rule does not apply is an effort to bring itself under the holding in *Wedeman v. City Chevrolet, supra,* 278 Md. 524, 366 A.2d 7. *Wedeman* was a deceit action by the buyer against the seller of an automobile which had been represented to be new and undamaged but which was in fact neither. The seller's representations had induced the buyer to buy. We said that the Maryland cases

had in common one salient fact: the contractual relationship preexisted the tortious conduct. Thus, the tort found its source in the contract without which the wrong would not have been committed. It was in this context that we spoke in *Testerman* of a "tort arising out of a

contractual relationship," and to which our holding there is applicable. Thus, when one may be induced by fraud to enter into a contract, the tort in that instance cannot be said to arise out of the contractual relationship. It is the tortious conduct which conversely induces the innocent party to enter into the contractual relationship. [278 Md. at 529, 366 A.2d at 11.]

Miller says that misrepresentations by respondents in Type III transactions induced it to enter into each of its contracts with Glenn Dale and that those contracts are to be analogized to the contract of sale in *Wedeman.* But as we have seen, respondents' conduct was fraudulent only because of their employment, and those employment contracts antedate the fraud. The role of the purchases by Glenn Dale in Type III transactions is that they appeared to Miller to be Type II transactions and they helped to conceal from Miller the breach of the duty of loyalty and the underlying fraud.

■ Miller also suggests that deceit actions generally are not within the *Testerman* rule. This argument is based on a statement, taken out of context, from *Wedeman.* The analysis in *Wedeman* first considered whether the misrepresentation there sued upon arose out of the automobile purchase agreement and, as explained above, *Wedeman* concluded that the tort was not one arising out of contract. It was then necessary to determine the standard for punitive damages in a deceit action which had not arisen out of a contract. In the latter connection we said: "Never, therefore, have we intimated that actual malice, in the sense of ill will, personal anomosity, hatred or spite, was necessary to recover punitive damages where fraud is established." *Wedeman,* 278 Md. at 530, 366 A.2d at 11.

Consequently, the instructions by the trial court were not correct, and under existing law the respondents' motion for judgment n.o.v. was properly granted.

## II

■ The next certiorari issue raised by Miller asks us to change the common law of this State and exclude fraud

cases from the *Testerman* rule. Because, under *Wedeman*, deceit actions in which the defendant's misrepresentation induced the relevant contract are not subject to the *Testerman* rule, the argument essentially deals with misrepresentations relating to contractual performance or nonperformance. Further, in order to benefit Miller, the nonperformance to which the proffered exception must apply must include the failure by a fiduciary to pay money. We shall consider such an exception in relation to the following factors.

First, although *Testerman*'s rule concerning punitive damages in the gray area of "contorts" is of relatively recent origin, this Court has analyzed claims for punitive damages in relation to that rule in a number of cases. *See Rite Aid Corp., supra* (as to the claim for slander of title); *General Motors Corp. v. Piskor, supra* (false imprisonment and assault); *Wedeman, supra* (deceit); *Henderson v. Maryland National Bank,* 278 Md. 514, 366 A.2d 1 (1976) (conversion); *Food Fair Stores v. Hevey,* 275 Md. 50, 338 A.2d 43 (1975) (conversion). The Court of Special Appeals has applied *Testerman* in a case where the defendant misrepresented that it had performed its contractual obligation to repair an airplane. *Aeropesca Ltd. v. Butler Aviation International,* 44 Md.App. 610, 411 A.2d 1055 (1980). We recognize the difficulty in applying the concept of a tort arising out of a contractual relationship, but we are not at all persuaded that an exception for fraud would produce a more workable rule. Courts have traditionally avoided attempting to define "fraud" precisely. Professor Sullivan, speaking of a fraud exception to a prohibition against punitive damages where the conduct is both a tort and a breach of contract, says:

> Many cases, however, ... fall into an uncertain twilight zone between "mere" breach and obvious tort. It is the decisions in this zone that mock pretentions to logical precision. Confusion in this area of the law is perhaps inevitable, for it is surely difficult to apply consistently a rule whose cardinal concept (fraud) many courts have

persistently defined in the most sweeping and general terms. [Sullivan, *Punitive Damages in the Law of Contract: The Reality and the Illusion of Legal Change*, 61 Minn.L.Rev. 207, 235 (1977) (footnotes omitted).]

Second, the principal argument for the fraud exception sought by Miller is that the actual malice requirement for punitive damages is too high and does not operate as a deterrent or punishment for fraud because of the difficulty of proof. *See* Strausberg, *Punitive Damages in Torts Arising Out of Contract in Maryland*, 13 U.Balt.L.Rev. 275 at 294 (1984). It is open to question to what extent those who would cheat their employers would be deterred from such conduct were we to announce in this case that implied, rather than actual, malice would be the standard for exemplary damages in cases of deceit arising out of a contractual relationship. In addition, in cases of the subject type, compensatory damages are not limited to the principal amount of the monies due. There is no reason why an employer from whom disloyal employees have diverted profits cannot, on the contract count at least, obtain prejudgment interest measured from the time the disloyal employee was obligated to account. *See I.W. Berman Properties v. Porter Brothers*, 276 Md. 1, 344 A.2d 65 (1975).[3] Further, there is a substantial overlap between intentional fraud and criminal fraud in which the criminal sanctions provide ample deterrence.

Finally, whatever deterrent value there would be in lowering the standard for punitive damages in cases of deceit arising out of a contractual relationship must be weighed against the potential for abuse. Fraud is so general a concept that the exception sought by Miller can easily present an even greater invitation than exists presently to exaggerate claims in order to intimidate unsophisticated persons into settlements where liability is questionable and the exposure for actual damages is minimal.

---

**3.** Miller did not request an instruction that the jury could, under the contract theory of the declaration, award prejudgment interest.

We decline Miller's invitation to create a fraud exception to the *Testerman* rule.

## III

Miller's third submission is that the circuit court abused its discretion in denying Miller's motion for a new trial because the "jury did not award damages in conformance with the court's instructions, the law and the evidence with regard to [respondents'] breach of fiduciary obligation." The thrust of this contention is that, even if Miller were not entitled to punitive damages, the compensatory damages were so inadequate as to compel the grant of its motion for a new trial.

■ We will not undertake to recount all of the legal and factual arguments which the respondents advanced in defense of the claims against them, but shall point only to an aspect of the compensatory damage instructions in this case. The jury was given alternative theories of compensatory damages. One theory was lost profits which could have been measured by the IRS Forms 1099. Under the other theory, the jury was told it could award Miller damages based on

> [t]he difference between what the customer actually paid for the appliance and/or cabinets and what the customer would have paid had he not purchased through [Glenn Dale].

> In considering this, you should also consider whether or not the customer would have purchased the materials through Miller once he or she realized and/or was advised that they could not obtain an entire package; that is, materials and installation.[4]

Miller did not except to the compensatory damage instructions. There was no abuse of discretion in denying the

---

4. We express no opinion as to whether the quoted instruction was a proper one under the facts of this case.

motion. *See Johnson v. Zerivitz,* 234 Md. 113, 198 A.2d 254 (1964); *Leizear v. Butler,* 226 Md. 171, 172 A.2d 518 (1961).

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.