571 A.2d 1219

**Virginia Lee SMITH, Individually, etc.**

v.

**Roland Randolph GROSS, Sr.**

No. 79, Sept. Term, 1989.

Court of Appeals of Maryland.

April 9, 1990.

H. Albert Korn, Baltimore, for appellant.

Edgar A. Baker, Jr. (Seidel and Baker, on brief), Salisbury, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, McAULIFFE and ADKINS, JJ., and CHARLES E. ORTH, Jr., Judge of the Court of Appeals (retired) Specially Assigned.

CHARLES E. ORTH, Jr., Judge, Specially Assigned.

I

Virginia Lee Smith is the natural mother of Roland Randolph Gross, Jr. The child was sired by Roland Randolph Gross, Sr., and born out of wedlock.[1] The child was killed

---

1. Throughout the record, Gross, Sr., is sometimes referred to as Roland Randolph Gross, Sr., and sometimes as Randolph Roland Gross, Sr. Gross, Jr., is sometimes referred to as Roland Randolph

in an automobile accident a few days after his second birthday. The mother brought an action in the Circuit Court for Dorchester County against the father, alleging that the child died as a result of the father's negligence. In the first count of the Complaint, the mother instituted a survival action. She claimed damages as the personal representative of the estate of the child for "the great conscious physical and emotional pain and suffering sustained by [the child] prior to his death and for funeral expenses...." In the second count, the mother instituted a wrongful death action. As the surviving mother of the child, she claimed damages involving the elements of solatium suffered by her by reason of "the tragic loss of her [only] son." In what was labeled as a third count, the mother, both as personal representative of the estate of the child and as the surviving mother of the child, claimed punitive damages.

The actions went before the court on the father's "Motion to Dismiss the Complaint," founded on the "failure to state a claim upon which relief can be granted." Md.Rule 2–322(b)(2). The court granted the motion. The mother noted an appeal. We certified the case to us *ex mero motu* before decision by the Court of Special Appeals.

## II

We pointed out in *Sharrow v. State Farm Mutual,* 306 Md. 754, 511 A.2d 492 (1986):

Under Md.Rule 2–322, a motion to dismiss for failure to state a claim serves the same function as the demurrer under former Rules 345 and 371 b.... Consequently, in considering the legal sufficiency of [a] complaint to allege a cause of action for tortious interference, we must

Gross, Jr., and sometimes as Randolph Roland Gross, Jr. For example, in the Bill of Complaint Gross, Sr., is designated as Roland Randolph, Sr., and Gross, Jr., as Randolph Roland Gross, Jr.

In any event, Gross, Sr., admits in his brief that Gross, Jr., was born out of wedlock to Virginia Lee Smith and him, acknowledging that he is the father.

assume the truth of all relevant and material facts that are well pleaded and all inferences which can be reasonably drawn from those pleadings.... On the other hand, any ambiguity or uncertainty in the allegations bearing on whether the complaint states a cause of action must be construed against the pleader.

*Id.* at 768, 511 A.2d 492 (citations omitted). The relevant and material facts set out in the Complaint here were sufficient to establish, if proved, that Virginia Lee Smith was the natural mother of the child, that she was the personal representative of his estate, that the child was killed in an automobile accident caused by the negligence of the father and that the mother and the child sustained damages therefrom. The Motion to Dismiss related that Gross, Sr., was the natural father of the child. The Answer to the Motion to Dismiss alleged that the mother and the father were never married, that the child "was born out of wedlock, and lived with his mother from the time of his birth until his death and never lived with his father."

## III

Maryland Code (1974, 1989 Repl.Vol.), § 6–401(a) of the Courts and Judicial Proceedings Article provides, except as to a cause of action for slander, that "a cause of action at law, whether real, personal, or mixed, survives the death of either party." Maryland Code (1974), § 7–401(x) of the Estates and Trusts Article authorizes a personal representative to prosecute, for the benefit of the estate, *"a personal action which the decedent might have commenced or prosecuted...."* (Emphasis added.) Such an action survives the decedent except for the slander of him during his lifetime, in which case the action dies with him. Section 7–401(x)(1).[2]

---

**2.** When a personal representative institutes an action against a tortfeasor for a wrong which resulted in the death of the decedent, the funeral expenses of the decedent may be recovered up to $2,000 in addition to any other damages recoverable in the action. Md.Code (1974), § 7–401(x)(2) of the Estates and Trusts Article.

■ Maryland Code (1989), § 3–901 through § 3–904 of the Courts and Judicial Proceedings Article creates an action for a wrongful death. Section 3–902(a) provides that "[a]n action may be maintained against a person whose wrongful act causes the death of another."

"Wrongful act" means an act, neglect, or default including a felonious act *which would have entitled the party injured to maintain an action and recover damages if death had not ensued.*

Section 3–901(e) (emphasis added). A parent, among others, may institute the action as a primary beneficiary. Section 3–904(a).[3]

The survival statute and the wrongful death statute have in common the authorization to commence and prosecute a personal action after the death of the decedent if the decedent[4] might have maintained the action when he was alive. The father urges that the child was barred from

---

**3.** When, as here, the action is for the death of a minor child, the damages awarded

> are not limited or restricted by the "pecuniary loss" or "pecuniary benefit" rule but may include damages for mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection ... filial care, attention, advice, counsel, training, guidance or education....

Maryland Code (1989), § 3–904(d) of the Courts and Judicial Proceedings Article.

For a comprehensive history of the survival statute and the wrongful death statute and the differences between them, *see Stewart v. United Elec. L. & P. Co.,* 104 Md. 332, 65 A. 49 (1906). *See also Smith v. Gray Concrete Pipe Co.,* 267 Md. 149, 158–159, 297 A.2d 721 (1972).

**4.** Early on, we accepted the term "injured party," in the wrongful death statute as meaning the "decedent," and we have been consistent in that interpretation. *See N.C.R.R. Co. v. State, Use of Burns,* 54 Md. 113 (1880); *State v. Consol. Gas, etc., Co.,* 146 Md. 390, 126 A. 105 (1924); *Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656, 464 A.2d 1020 (1983). *See also Burke v. United States,* 605 F.Supp. 981 (D.C. Md.1985):

> The Maryland law appears to be that if a decedent could not have brought a cause of action for injury at the time of death, the wrongful death action similarly is precluded.

*Id.* at 988.

suing him by the doctrine of parent-child immunity, as adopted and applied by this Court.

The general rule is that defenses which would have been good against the decedent, had the decedent survived, are good against the decedent's personal representatives and, in their capacity as Lord Campbell's Act claimants, the decedent's survivors. As to survival actions, *see* 4 Harper, James & Gray, *The Law of Torts*, § 23.8 at 449 (2d ed. 1986) ("Where the statute provides for the survival of [the decedent's] action, the surviving action is derivative in the fullest sense of the term, and the result of the cases [*i.e.*, contributory negligence of decedent bars estate's action] comes as near to being demanded by inexorable logic as anything does"). Actions under Maryland's Lord Campbell's Act, however, are not as purely derivative as survival actions. That statute's requirement of an act "which would have entitled the party injured to maintain an action and recover damages if death had not ensued," clearly excludes a wrongful death action if there would be no cause of action on the decedent's part, had the decedent survived. *See State, Use of Bond v. Consol. Gas, etc. Co.*, 146 Md. 390, 126 A. 105 (1924) (holding, prior to the "fall of the citadel," that a wrongful death action based on an allegedly defective product did not lie on behalf of survivors of a deceased child who was not in privity with the defendant seller). Of particular significance here is that the decedent, if surviving, not only must have been able to "maintain an action" but also to "recover damages." We have, in effect, interpreted this language to include defenses. *See Frazee v. Baltimore Gas & Elec. Co.*, 255 Md. 627, 258 A.2d 425 (1969) (contributory negligence of decedent is defense to survivor's Lord Campbell's Act claim); *State, Use of Brandau v. Brandau*, 176 Md. 584, 6 A.2d 233 (1939) (same); *State, Use of Potter v. Longeley,* 161 Md. 563, 570, 158 A. 6, 8 (1932) (same); *North Cent. Ry. Co. v. State, Use of Burns*, 54 Md. 113 (1880) (same); *State, Use of Foy v. Philadelphia, Wilm & Balto. R.R.*, 47 Md. 76 (1877) (same); *see also Baltimore & Potomac R.R. v. State,*

*Use of Abbott,* 75 Md. 152, 23 A. 310 (1892) (assumption of risk by decedent is defense). Thus, the issue here is whether the defense of parental immunity is an exception to the general rule.

### IV

Some 50 years ago, we adopted a general rule refusing to allow actions between parent and minor child for personal torts. *Schneider v. Schneider,* 160 Md. 18, 152 A. 498 (1930). *See Frye v. Frye,* 305 Md. 542, 505 A.2d 826 (1986). Over the years we have recognized two exceptions. We have held that immunity does not apply with respect to a minor child and a parent whose conduct was cruel and inhuman or wanton and malicious, and with respect to a parent and a child who is emancipated at the time the conduct occurred. *Frye* at 546–548, 505 A.2d 826, citing *Mahnke v. Moore,* 197 Md. 61, 77 A.2d 923 (1951), and *Waltzinger v. Birsner,* 212 Md. 107, 128 A.2d 617 (1957). We have, from time to time, refused to abrogate the rule or to modify it further. Against the modern trend, we specifically declined to do so generally as to motor torts. In the light of compulsory motor vehicle liability insurance, part of an elaborate scheme constructed by the legislature for the general welfare and protection of the people of this State, we believed that a blanket exception of motor vehicle torts from the parent-child immunity rule was best left to the General Assembly. *Frye,* 305 Md. at 562–567, 505 A.2d 826. The General Assembly has not acted in this regard. The mother, however, urges that the parent-child immunity rule is simply not applicable because the rationale supporting the rule is not appropriate under the facts and circumstances here.

### V

The rationale of the rule is that it is founded upon the relation in which the parent and the unemancipated minor child stand to each other. The

reciprocal dependence and entitlement of that relationship promotes a public policy which the rule reflects.

*Frye,* 305 Md. at 548, 505 A.2d 826.[5] The public policy which the rule reflects has been long recognized by this Court. We observed in *Frye,* 305 Md. at 551–552, 505 A.2d 826:

> It is clear that for over half a century this Court has recorded its belief in the importance of keeping the family relationship free and unfettered. Our primary concern with regard to matters involving the parent-child relationship was the protection of family integrity and harmony and the protection of parental discretion in the discipline and care of the child. We have steadfastly recognized the authority of parents and their need to fulfill the functions devolved upon them by that position. The parental status should be held inviolate so that there be no undue interference with the dependence of the minor unemancipated child on the parents for such judgment and care needed during the child's minority or with the dependence of the law on the parent for fulfillment of the necessary legal and social functions associated with the office of parent. This Court has declared it to be the public policy that discipline in the family not be impaired and that tranquility of the home be preserved. Matters which tend to disrupt or destroy the peace and harmony of family or home are not to be condoned.

In short, as we declaimed in *Schneider v. Schneider, supra,* the seminal case on the rule in this jurisdiction:

> "Both natural and politic law, morality, and the precepts of revealed religion alike demand the preservation of [the parent-child] relation in its full strength and purity."

---

**5.** We observe that the fact that a child is born out of wedlock is of no import as to the rule. The man who begot the child is the father of that child and the woman who delivered the child is the mother of that child. Being the father and the mother, each is a parent and within the ambit of the rule whether or not they were married when the child was conceived or born. The legitimacy *vel non* of the child is immaterial.

*Id.* 160 Md. at 23–24, 152 A. 498 (quoting Scheinler, *Domestic Relations* § 23). We discussed at length in *Frye* the obligations and rights of the parent-child relationship arising both in the common law and various legislative enactments. 305 Md. at 558–561, 505 A.2d 826. We found that legislative enactments tended to strengthen the rationale of parent-child immunity rather than weaken it. *Id.* at 559, 505 A.2d 826. We were aware in *Frye* that

> the fifty-four years which have elapsed since *Schneider* have been marked by shifting values in a changing world.

*Id.* at 561, 505 A.2d 826. "But," we found,

> both this Court and the legislature have been faithful to the promotion of the stability, harmony and peace of the family and to the preservation of parental authority and the family unity as a matter of public policy in the best interests of society.

*Id.*

## A

The mind-set of the mother is that "[t]he parent-child immunity doctrine is inapplicable to the case at bar because there is no parent-child relationship to protect." She points to the fact that the child never lived with his father. She asserts that "parental discipline is not capable of impairment" because "there isn't any family relationship" between the father and the child.

It does not follow that merely because the parents' relationship had not culminated in marriage and because the mother, the father, and the child did not reside together in a common home, there was no family relationship within the ambit of the rule between the father and the child. Rights and obligations, privileges and duties—the elements of parenthood—existed between the father and child despite that the child "lived with his mother from the time of his birth until his death and never lived with his father." The maintenance of a common home is not the *sine qua non* of the elements of parenthood. The primary

requisite of a father-child relationship is not that a person reside with the child but that the person is, in fact, the father of the child. It is by reason of being the father that certain rights, privileges, obligations, and duties arise. In *Frye* at 558–561, 505 A.2d 826, we detailed those elements of parenthood as they existed at the common law and as they were created by various statutes. It is the parental status reflected by them that the rule serves to hold inviolate

> so that there be no undue interference with the dependence of the minor unemancipated child on the parents for such judgment and care needed during the child's minority or with the dependence of law on the parent for fulfillment of the necessary legal and social functions associated with the office of parent.

*Id.* at 552, 505 A.2d 826. Here, the rights, privileges, obligations, and duties arising from the father-child relationship were not wiped out merely because the child lived with the mother. *See* the Family Law Article of the Maryland Code (1984) referred to in *Frye* at 559–561, 505 A.2d 826.

The record does not disclose the full amount of the father's participation in the life of the child. Clearly, he had not completely abandoned the parental relationship; the child was with him at the time of the accident. There is no indication that he had forfeited his parental obligations, responsibilities, and duties by acts and conduct, as was the case in *Mahnke v. Moore, supra,* or that he had forsworn his parental authority, rights, and privileges. There is no suggestion that the father was not fulfilling his responsibility for the child's support, care, nurture, welfare, and education. Md.Code (1984), § 5–203(b)(1) of the Family Law Article. *See Frye* at 560, 505 A.2d 826.

Under the circumstances revealed in the record before us, we hold that the parent-child immunity rule was applicable during the life of the child. While the child was alive, the father was entitled to the immunity which the rule affords.

■ Our holding is dispositive of this appeal. The survival statute and the wrongful death statute are clear and certain. The only prerequisite for the prosecution of the actions authorized is the entitlement of the injured decedent to maintain the respective action and recover damages if death had not ensued. "Because there is a lack of relevant legislative history, we must rely substantially on the language of the statutes in the context of the goals and objectives they seek to achieve." *Subsequent Injury Fund v. Teneyck, et al.,* 317 Md. 626, 632, 566 A.2d 94, 97 (1989), citing *Kaczorowski v. City of Baltimore,* 309 Md. 505, 513–516, 525 A.2d 628 (1987). The legislature has not addressed the rule although it surely has been aware of parent-child immunity followed in the courts of this State for over 50 years. The appellate courts of this State have from time to time specifically called the legislature's attention to the rule. *See Frye v. Frye,* 305 Md. at 566–567, 505 A.2d 826; *Latz v. Latz a/k/a Schafer,* 10 Md.App. 720, 733–734, 272 A.2d 435, *cert. denied,* 261 Md. 726 (1971). The legislature has not responded. Thus, the survival statute and the wrongful death statute stand legislatively unsullied by the rule. The rule impacts on the statutes only in the determination whether the decedent might have maintained an action against the tortfeasor while the decedent was alive. If the rule applies, the survival and wrongful death actions are precluded; if the rule does not apply, the actions are permitted. If the legislature intended that the judicially created parent-child immunity rule be excepted from the legislatively created survival and wrongful death actions, it has had ample opportunity to say so. But it has allowed the rule to stand inviolate as we have adopted and applied it, without change or modification. In this case it serves to bar an action by the child while living against the father. Therefore, the mother is precluded from proceeding against the father in her own right as a parent or as the personal representative of the child's estate.

The mother looks primarily to the subsequent death of the child as making the rule inapplicable. But a personal

tort action by the child while alive was killed by the rule. The death of the child did not serve to remove the immunity dictated by the rule and resurrect the action.

The Circuit Court for Dorchester County did not err in granting the father's Motion to Dismiss.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY AP-PELLANTS.

ELDRIDGE, J., dissents with opinion in which ADKINS, J., concurs.

ELDRIDGE, Judge, dissenting:

The majority observes that the principle of parent-child immunity serves "the public policy that discipline in the family not be impaired and that tranquility of the home be preserved." *Frye v. Frye,* 305 Md. 542, 552, 505 A.2d 826, 831 (1986). I dissent in this case because the majority has applied parent-child immunity to a situation where the underlying public policy will not be served. In light of Roland Gross, Jr.'s death, there is no family discipline to impair or home tranquility to preserve.

I agree with the majority's holding that parent-child immunity would have applied, under our prior holdings and the facts of this case, if the child were still alive.[1] I do not, however, read the survival and wrongful death statutes to require a recognition of this immunity where no public policy would be served.

---

1. In her complaint, Virginia Lee Smith alleged that Gross, Sr. "operat[ed] his automobile while under the influence of alcohol ... [and] in a careless and reckless manner...." She also alleged that his driving "constituted a reckless and careless disregard of the safety of the decedent thereby entitling Plaintiff to punitive damages." A plaintiff must show malice to support an award of punitive damages. *Miller Building Supply v. Rosen,* 305 Md. 341, 348, 503 A.2d 1344, 1347 (1986). Even under the circumstances of this case, Gross, Sr.'s conduct would not rise to the level of "abandonment of the parental relation" necessary for him to forfeit his parental immunity. *See Mahnke v. Moore,* 197 Md. 61, 68, 77 A.2d 923, 926 (1951).

At common law, "if an injury were done either to the person or property of another, for which *damages* only could be recovered in satisfaction, the action died with the person *to* whom or *by* whom, the wrong was done." *Stewart v. United Elec. L. & P. Co.*, 104 Md. 332, 333–334, 65 A. 49, 50 (1906). By enacting Ch. 101, Subch. 8, § 5, of the Acts of 1798, the General Assembly enabled executors and administrators to bring survival actions:

> "Executors and administrators shall have full power and authority to commence and prosecute any personal action whatever, at law, or in equity, (as the case may require,) which the testator or intestate might have commenced and prosecuted, except actions of slander, and for injuries or torts done to the person...."

By the late nineteenth century, the exclusion for tortious injuries had been eliminated, giving executors and administrators full power to commence suits for the recovery of damages for injuries suffered by the testator or intestate in his lifetime. *Stewart v. United Elec. L. & P. Co., supra,* 104 Md. at 337, 65 A. at 51. Today, Maryland Code (1974), § 7–401(x) of the Estates and Trusts Article, provides that a personal representative:

> "may prosecute, defend, or submit to arbitration actions, claims, or proceedings in any appropriate jurisdiction for the protection or benefit of the estate, including the commencement of a personal action which the decedent might have commenced or prosecuted, except [an action for slander]...."

The wrongful death statute was also a modification of the common law. "Prior to 1852, under the common law, Maryland permitted no recovery for pecuniary loss suffered by a relative of one killed by the negligence of another." *McKeon v. State, Use of Conrad*, 211 Md. 437, 442, 127 A.2d 635, 637 (1956). By Ch. 299, § 1, of the Acts of 1852, the General Assembly, borrowing from Lord Campbell's Act, provided that:

> "whensoever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or

default is such as would (if death had not ensued), have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every such case the person who would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to felony."

Under current law, Code (1974, 1989 Repl.Vol.), § 3–902(a) of the Courts and Judicial Proceedings Article, "[a]n action may be maintained against a person whose wrongful act causes the death of another." Section 3–901(e) defines a "wrongful act" as:

"an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued."

Thus, the two phrases emphasized by the majority, "a personal action which the decedent might have commenced or prosecuted" from the survival statute, and "which would have entitled the party injured to maintain an action and recover damages if death had not ensued" from the wrongful death statute, are substantially unchanged from the language in the Acts of 1798 and 1852, respectively.

As the majority notes, this Court has held that defenses such as lack of privity, contributory negligence and assumption of risk, on the part of the decedent, are defenses to a wrongful death claim. I agree with the majority that these types of defenses would also be recognized in survival actions. I believe that the purpose of the two phrases quoted above was to identify the types of events that would trigger liability under the statutes: the events had to give rise to cognizable causes of action. Circumstances such as contributory negligence and assumption of risk bar *every* tort action, regardless of the identity or relationship of the parties. An immunity such as parent-child immunity, on the other hand, does not mean that no cause of action exists. It means that a recovery will not be permitted because of overriding public policy. I doubt that the surviv-

al and wrongful death statutes were intended to incorporate every immunity and public policy defense that this Court had recognized, or would recognize in the future, under circumstances where no public policy would be served by incorporation.

The Court of Appeals first recognized parent-child immunity in 1930, over 75 years after the enactment of the wrongful death statute, and over 130 years after the survival statute went into effect. *See Schneider v. Schneider,* 160 Md. 18, 152 A. 498 (1930). In *Yost v. Yost,* 172 Md. 128, 134, 190 A. 753, 756 (1937), the Court stated that as a "general principle," "for acts of passive negligence incident to the parental relation, there is no liability." In that case, the Court emphasized the need to preserve the peace and harmony of the home and recognize the authority of parents. *Ibid. See Frye v. Frye, supra.*

This Court has not applied the general principle of parent-child immunity in cases where the public policy underlying the principle would not be served. For example, in *Mahnke v. Moore,* 197 Md. 61, 77 A.2d 923 (1951), the plaintiff infant's father murdered her mother and later committed suicide, both in the child's presence. When the child sued her father's executrix to recover for personal injuries, parental immunity was imposed as a defense. Under the circumstances of the case, the Court reasoned that

> "there can be no basis for the contention that the daughter's suit against her father's estate would be contrary to public policy, for the simple reason that there is no home at all in which discipline and tranquility are to be preserved." 197 Md. at 68, 77 A.2d at 926.

The Court also concluded that

> "when, as in this case, the parent is guilty of acts which show complete abandonment of the parental relation, the rule giving him immunity from suit by the child, on the ground that discipline should be maintained in the home, cannot logically be applied, for when he is guilty of such acts he forfeits his parental authority and privileges, including his immunity from suit." *Ibid.*

Furthermore, in *Waltzinger v. Birsner,* 212 Md. 107, 125–126, 128 A.2d 617, 626–627 (1957), this Court held that there was no parental immunity to bar a suit between a parent and a child who was emancipated. Moreover, we recently held, in *Hatzinicolas v. Protopapas,* 314 Md. 340, 550 A.2d 947 (1988), that the policies served by parent-child immunity did not require an extension of the principle to bar a child's recovery in negligence from a parent's business partner, where the partnership was responsible for an injury.

In both *Mahnke v. Moore, supra,* and *Waltzinger v. Birsner, supra,* where no parent-child relationship still existed, the Court did not recognize an immunity. In this case, the death of Gross, Jr. severed the parent-child relationship and terminated the basis for immunity. This suit cannot "be contrary to public policy, for the simple reason that there is no home at all in which discipline and tranquility are to be preserved." *Mahnke v. Moore, supra,* 197 Md. at 68, 77 A.2d at 926. I disagree with the majority's conclusion that "[t]he death of the child did not serve to remove the immunity dictated by the rule." I would follow the reasoning of courts that have refused to recognize parent-child immunity where, because of a death, no public policy would be served by the immunity.

In *Harlan National Bank v. Gross,* 346 S.W.2d 482 (Ky.1961), Kentucky's highest court held that the principle of parent-child immunity would not bar the administrator of a deceased infant's estate from bringing a cause of action against the infant's parent for wrongful death caused by negligence in an automobile accident. The court explained (346 S.W.2d at 483):

"[t]he reason for denying a cause of action in tort by a living child against its parent no longer applies to a suit by the child's administrator. The rule of non-liability is based upon a public policy to protect from disruption a family relationship. This potential evil is removed by the death of the child. Consequently there is no longer such a public policy objection to a claim asserted by an administrator."

Many other state courts are in accord with this view. *See, e.g., Johnson v. Myers,* 2 Ill.App.3d 844, 277 N.E.2d 778, 779 (1972) ("when the family relationship has been dissolved by death the stated policy behind the rule of family immunity ceases"); *Plumley v. Klein,* 31 Mich.App. 26, 187 N.W.2d 250, 252–253 (1971), *aff'd,* 388 Mich. 1, 199 N.W.2d 169 (1972) ("the reasons for the doctrine of intra-family immunity have been terminated by death"); *Palcsey v. Tepper,* 71 N.J.Super. 294, 176 A.2d 818, 819 (1962) ("It is self-evident that if the family relationship no longer exists, having been dissolved by death, then the public policy consideration which supports the rule of immunity likewise no longer exists"); *Sisler v. Seeberger,* 23 Wash.App. 612, 596 P.2d 1362, 1364 (1979) ("Here, the parent is dead and the relationship is thus severed. As a result, there is no parental authority or family tranquility to be preserved"); *Brennecke v. Kilpatrick,* 336 S.W.2d 68, 73 (Mo.1960); *Gaudreau v. Gaudreau,* 106 N.H. 551, 215 A.2d 695, 696 (1965); *Dorsey v. State Farm Mut. Auto. Ins. Co.,* 9 Ohio St.3d 27, 457 N.E.2d 1169, 1171 (1984); *Parks v. Parks,* 390 Pa. 287, 135 A.2d 65, 71 (1957). *See also Barnwell v. Cordle,* 438 F.2d 236, 240 (5th Cir.1971); *Dennis v. Walker,* 284 F.Supp. 413, 416–417 (D.D.C.1968); *Restatement (Second) of Torts* § 895G comment g (1977); 2 Harper, James & Gray, *The Law of Torts,* § 8.11 at 574 (2d ed. 1986) ("It would seem, however, that the reasons of policy developed in these cases [establishing the principle of parent-child immunity] are [not] persuasive ... where one of the parties has died ...").[2]

The majority suggests that "[i]f the legislature intended that the judicially created parent-child immunity rule be excepted from the legislatively created survival and wrong-

---

**2.** There are other courts that have held to the contrary. *See, e.g., McNeal v. Administrator of Estate of McNeal,* 254 So.2d 521, 523–524 (Miss.1971); *Skinner v. Whitley,* 281 N.C. 476, 189 S.E.2d 230, 234 (1972); *Castellucci v. Castellucci,* 96 R.I. 34, 188 A.2d 467 (1963); *Campbell v. Gruttemeyer,* 222 Tenn. 133, 432 S.W.2d 894, 897–900 (1968); *Lasecki v. Kabara,* 235 Wis. 645, 294 N.W. 33, 35 (1940).

ful death actions, it has had ample opportunity to say so." Of course, when the General Assembly created the survival and wrongful death actions, there existed in Maryland no parent-child immunity rule to be "excepted." The rule was created by this Court at a much later date, and this Court has not hesitated to hold the rule inapplicable when the policy underlying the rule is inapplicable.

Parent-child immunity is a general principle that sometimes serves a public policy of promoting family discipline and domestic tranquility. As our prior cases show, it is not an absolute rule. Therefore, I would hold that the circuit court erred in recognizing parent-child immunity in a case where, because of the death of the child, there was no policy to be served.

Judge ADKINS has authorized me to state that he concurs with the views expressed herein.