834 A.2d 146

James W. DEHN et ux.

v.

Glenn R. EDGECOMBE et al.

No. 1536, Sept. Term, 2002.

Court of Special Appeals of Maryland.

Sept. 4, 2003.

Reconsideration Denied Nov. 24, 2003.

658

David Lapp (Law Offices of Scott Hempling, P.C., on brief), Silver Spring, (Larry Burch, Burch & Burch-Rates, L.L.C., on brief), Greenbelt, for appellants.

Argued before GREENE, SHARER, CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

MOYLAN, J.

The appellants, James and Corrinne Dehn, husband and wife, brought a four-count complaint against the appellee, Dr. Glenn Edgecombe, in the Circuit Court for Prince George's County. At the end of the plaintiffs' case, judgment was granted against the appellants on three of those four counts, and no issue as to them is raised on this appeal.

The only count that concerns us is the one that charged Dr. Edgecombe with negligence in failing to provide proper post-operative care to Mr. Dehn following a vasectomy. At the end of the plaintiffs' case, Judge Michelle D. Hotten granted judgment against Mrs. Dehn on that count. The trial went forward on Mr. Dehn's claim of negligence against Dr. Edgecombe. The ultimate two-pronged jury verdict was 1) that Dr. Edgecombe had negligently breached the applicable standard of care and his negligence was the proximate cause of Mr. Dehn's damages, but 2) that Mr. Dehn had himself been contributorily negligent.

With respect to the verdict of contributory negligence, the appellants do not claim that the evidence was not legally sufficient for Judge Hotten to have submitted the issue to the jury, nor do they claim any error in jury instructions on that issue. On appeal, the appellants raise the three issues:

1. that judgment was erroneously granted against Mrs. Dehn on the count charging negligence;

2. that three erroneous evidentiary rulings denied the jury probative evidence on the issues of 1) primary negligence, 2) contributory negligence and 3) the calculation of damages; and

3. that Judge Hotten erroneously limited the proof of damages to direct medical expenses and child-rearing costs.

### Factual Background

At some time during 1994, when Mrs. Dehn was pregnant with the couple's second child, the Dehns decided not to have any more children. To that end, they decided that Mr. Dehn should undergo a vasectomy. Mr. Dehn discussed his desire

with Dr. Edgecombe, his family practice doctor. Because Dr. Edgecombe was not qualified to perform a vasectomy, he referred Mr. Dehn to a surgeon, Dr. Samuel F. Mazella, who ultimately performed the vasectomy on October 24, 1995. There is no issue with respect to the referral to Dr. Mazella or with respect to the vasectomy itself.

Nor is there any issue with respect to the post-operative care, including post-operative advice, rendered by Dr. Mazella. Dr. Mazella expressly warned Mr. Dehn that the procedure might not be effective and that Mr. Dehn might still be able to father a child. To best insure against an unwanted pregnancy, Dr. Mazella instructed Mr. Dehn 1) that he was not to have unprotected sexual relations for six months and 2) that, during that time, he was to have at least twenty ejaculations. Dr. Mazella further provided Mr. Dehn with three prescriptions for semen analyses. He instructed Mr. Dehn to have the first semen analysis done after twenty ejaculations, and then to have the remaining two semen analyses completed at some time during the remainder of the initial six month period. The results of those tests were to be sent to Dr. Mazella's office. Only if and when the third analysis proved negative for sperm was the vasectomy to be considered to be a successful birth control measure. Dr. Mazella further expressly instructed Mr. Dehn to contact him, Dr. Mazella, if he had any concerns or problems during the post-operative period.

The evidence abundantly showed that Mr. Dehn negligently failed to follow Dr. Mazella's instructions. He never used the three prescriptions for semen analysis, because, he claimed, they were "vague" and they did not give him specific directions as to a laboratory, a date, or a location for the sperm count test. Mr. Dehn acknowledged that one reason he did not follow instructions was because he speculated that his health plan would probably not pay for the tests. Obviously, no sperm test results were ever sent by Mr. Dehn to Dr. Mazella's office.

Mr. Dehn testified that he was not aware that three semen tests were required. At one point, he stated that he thought

the tests were merely a "follow-up" after the passage of six months and twenty ejaculations, without pointing out the significance of that conclusion. Mr. Dehn acknowledged that, notwithstanding the instructions to contact Dr. Mazella about any questions or concerns, he never again contacted Dr. Mazella. Mr. and Mrs. Dehn engaged in unprotected sexual relations in December of 1996, at which time she conceived the child whose unwanted birth is the object of the present suit.

All of the controversy swirls about the nature of one or more conversations between Mr. Dehn and Dr. Edgecombe during the period between the performance of the vasectomy in October of 1995 and the onset of Mrs. Dehn's pregnancy in December of 1996. During that time, Mr. Dehn saw Dr. Edgecombe, his primary care provider, on at least several occasions for medical matters unrelated to the vasectomy.

Dr. Edgecombe testified that it was not until July 8, 1996, eight months after the vasectomy, that he even learned, in the course of a visit for an unrelated matter, that the vasectomy had, indeed, been performed on Mr. Dehn. He stated that it was standard practice for only the specialist surgeon who performed the operation to handle all aspects of post-operative care, including the monitoring of semen analyses. He testified that on a single occasion, the visit of July 8, 1996, Mr. Dehn raised with him the subject of a semen analysis and that the subject came up in a casual and offhand manner as they were leaving the office.

"I had seen Mr. Dehn for a medically related topic. We were done. We were leaving the room and he said, 'Oh, by the way, Doctor, I need a semen analysis.' [It] was highly unusual. No patient has ever asked me that before. Again, we were not in the room, we were in the hall leaving.

The patient said to me, 'Dr. Mazella never asked or wanted to get a semen analysis.' That was unusual, and I told Mr. Dehn that I[had] had a vasectomy in the past and my urologist had wanted to get a semen analysis at three months after the vasectomy or after 13 ejaculations. At

that point it was almost nine months past the point where this would have routinely been done.

I told Mr. Dehn also [that] it takes at least 13 ejaculations for the *vas deferens,* the sperm duct, to be emptied after a successful vasectomy. He told me that he had over twenty protected ejaculations. I also told Mr. Dehn in the hall that I had not heard of a vasectomy failing. Based on what he told me, that it was now six months after the fact when they are routinely done, and that he had twenty protected ejaculations, I'd assume that the surgeon had done the procedure correctly.

He also seemed to indicate that the surgeon had discharged him a long time previously and, based on that, I said 'I guess you don't need to have a semen analysis. It should have been done at three months.' "

Dr. Edgecombe further testified that if Mr. Dehn had ever told him that he had not had a single semen analysis test and had not been discharged by Dr. Mazella, he would have sent Mr. Dehn back to Dr. Mazella. Dr. Edgecombe presented the expert opinion of Dr. Boyle, a family practitioner, that because of the referral of Mr. Dehn to Dr. Mazella, 1) there was no doctor-patient relationship between Dr. Edgecombe and Mr. Dehn as to the vasectomy and the post-operative care, 2) the patient had the responsibility to follow the instructions of the specialist, and 3) the referring physician could assume that such instructions were followed.

Mr. Dehn, by way of stark contrast, testified that he had expressly asked Dr. Edgecombe for "a referral for a semen analysis" on three separate occasions. The first was on May 24, 1996, when Mr. Dehn told Dr. Edgecombe that six months had passed since his vasectomy, that he had had twenty ejaculations, and that he needed a semen analysis to make certain that he was sterile. Dr. Edgecombe, however, reassured Mr. Dehn that there was no need for a semen analysis and that there was no risk of impregnating his wife. Mr. Dehn informed his wife about what Dr. Edgecombe had said,

but she still wanted to wait for a semen analysis before engaging in unprotected sexual relations.

Accordingly, Mr. Dehn again raised the subject with Dr. Edgecombe on the occasion of his next medical appointment on July 9. He again asked Dr. Edgecombe for a referral for a semen analysis and was again told that there was no need for one. Mrs. Dehn, however, still insisted on waiting for a semen analysis before having unprotected sexual relations.

Mr. Dehn, according to his testimony, brought the subject up with Dr. Edgecombe on yet a third occasion on November 13, 1996. According to his testimony, Dr. Edgecombe replied:

> "Jimmy, personally I had a vasectomy seven years ago. I didn't have a sperm count done. Me and my wife [sic] have practiced regular relations. You're not going to get your wife pregnant. Will you go home, [and] tell your wife I personally assure her you cannot father any children."

Dr. Edgecombe, on the other hand, denied that he had even seen Mr. Dehn on November 13, for any reason.

### The Evidentiary Issues

It behooves us to consider first the appellants' contention alleging three evidentiary errors. It is the only issue bearing, even partially, on the propriety of the verdict of contributory negligence. If that verdict stands unreversed, the appellants' other contentions become moot.

Even with respect to the evidentiary issues, moreover, we may narrow the focus of the contention yet further. The appellants allege that Judge Hotten erroneously rejected evidence that would have been relevant 1) in proving Dr. Edgecombe's primary negligence, 2) in disproving Mr. Dehn's contributory negligence, and 3) in calculating damages. As the appellants characterize the tripartite impact of the evidentiary rulings:

> The trial court excluded three categories of evidence that Mr. Dehn argued was essential to the jury's determination of [1] the doctor's negligence, [2] the reasonableness of Mr. Dehn's conduct, and [3] the calculation of damages.

Our concern is exclusively with the possible impact of the challenged evidence on the jury's consideration of contributory negligence. Even the erroneous rejection of the evidence could not have created ultimate prejudice on the first sub-issue for, even without the benefit of the disputed evidence, the jury found in Mr. Dehn's favor on the question of Dr. Edgecombe's primary negligence. Mr. Dehn enjoyed total victory on that issue. As to it, there is no way he could have done better than he did.

Even the erroneous rejection of the disputed evidence would have worked no prejudice on the issue of damages, moreover, for if the contributory negligence verdict stands, any question as to damages is self-evidently moot. If the appellants are entitled to no damages at all, it is immaterial what the jury might have considered had it been required to calculate damages. That eventuality never came to pass and the hypothecized error has never made it out of the subjunctive mood.

As we now approach our consideration of the specific evidentiary sub-issues, it also behooves us to remember that evidentiary rulings, particularly those involving relevance, are entrusted to the wide discretion of the trial judge. Appellate courts are highly deferential to rulings of the trial court in that regard and will not presume to second-guess such rulings absent a clear abuse of the trial judge's discretion. *Smallwood v. Bradford*, 352 Md. 8, 27, 720 A.2d 586 (1998); *Merzbacher v. State*, 346 Md. 391, 404, 697 A.2d 432 (1997); *North River Ins. Co. v. Mayor and City Council of Baltimore*, 343 Md. 34, 89–90, 680 A.2d 480 (1996); *Armstead v. State*, 342 Md. 38, 66, 673 A.2d 221 (1996).

## A. The Plaintiffs' Reasons for Seeking the Vasectomy

At the outset of the trial, Dr. Edgecombe moved *in limine* to preclude any reference to Mr. Dehn's preexisting medical condition as his reason for seeking a vasectomy. Judge Hotten granted the motion for two reasons: 1) that the evidence was not relevant to prove any issue in the case; and 2) that, even if arguably relevant, the likely prejudicial impact

of the evidence outweighed its probative value. We hold that she was right for both reasons.

■ Reversing the order of our consideration, we agree that the prejudicial impact could have been substantial. Without supportive medical evidence but through the testimony of Mr. Dehn alone, the plaintiffs sought to inject into the case 1) that Mr. Dehn suffered from peripheral artery disease, 2) that he would likely suffer the amputation of both legs by the time he was in his mid-forties, 3) that he would die before he was fifty, and 4) that a widowed Mrs. Dehn would be economically unable to provide for a third child. At argument on the motion, the attorney for the plaintiffs summarized the things he sought to prove.

> Dehn has been diagnosed with peripheral artery disease. He's under the impression and was under the impression at the time he sought the sterilization, as was his wife, that *he will lose the circulation into his lower limbs and eventually by his mid 40's, they will be amputated.* He had undergone a surgery relevant to the peripheral artery disease. And that shortly before the sterilization, and it is his belief, *his life expectancy will be around 50.* Given those facts and his wife's limited ability to earn money in this country, they decided that two children was enough. They didn't want to leave the family having to support a third child, that he sought the sterilization.

(Emphasis supplied).

We cannot fault Judge Hotten's conclusion that that combination of grim circumstances would have engendered massive jury sympathy for the plaintiffs of a type that might readily override mere legal reasons against a verdict in their favor. If ever sympathy had the power to move jurors to overlook the law, this was such a case. It is exactly the sort of thing the balancing test seeks to avoid. Maryland Rule 5–403.

■ In turning to Judge Hotten's initial reason for her ruling, that based on the lack of relevance, we now have the luxury of assessing relevance exclusively in terms of its probative value on the issue of Mr. Dehn's contributory negligence.

Even now at the appellate stage, however, the plaintiffs' primary argument for evidentiary error on this sub-issue remains one based on *Jones v. Malinowski*, 299 Md. 257, 473 A.2d 429 (1984), and its arguable holding that the reason for seeking a sterilization may be pertinent to the calculation of damages, if and when liability is established. Indeed, in all of the extensive argument before Judge Hotten on the motion *in limine*, there was no remote mention of contributory negligence as the subject of the evidence's probative value. The current argument is an afterthought.

The quality of relevance was fully explained by *State v. Joynes*, 314 Md. 113, 119–20, 549 A.2d 380 (1988):

There are two important components to relevant evidence: materiality and probative value. Materiality looks to the relation between the propositions for which the evidence is offered and the issues in the case. *The second aspect of relevance is probative value, which is the tendency of evidence to establish the proposition that it is offered to prove.* See *McCormick on Evidence* § 185, at 541 (E. Cleary 3d ed.1984). Although the relevancy assessment is not susceptible to precise definition, it has been suggested that "the answer must lie in the judge's own experience, his general knowledge, and his understanding of human conduct and motivation." See *McCormick on Evidence* § 185, at 544 (E. Cleary 3d ed.1984). Evidence which is thus not probative of the proposition at which it is directed is deemed "irrelevant." *Dorsey, supra*, 276 Md. at 643, 350 A.2d at 669; Wharton's *Criminal Evidence* § 151 (13th ed.1972). The trial judge is usually in the best position to evaluate the probative value of the proffered evidence. Where evidence is utterly lacking in probative value, it may be condemned as "remote" or "speculative."

(Emphasis supplied).

In our judgment, the plaintiffs' attempt to explain a logical relationship between their reason for seeking sterilization and Mr. Dehn's failure to follow his surgeon's advice is nonsensical or, in the words of *State v. Joynes*, "remote" and "specula-

tive." Mr. Dehn was contributorily negligent in that 1) he failed to follow Dr. Mazella's explicit instructions, 2) he resumed unprotected sexual relations with his wife without satisfying the preconditions set out by Dr. Mazella, and 3) he failed to consult further with Dr. Mazella as to any doubts he may have entertained.

 That a patient unreasonably delays in obtaining medical testing, examination, or treatment as directed or prescribed by the treating physician is relevant evidence of contributory negligence. *Hill v. Wilson,* 134 Md.App. 472, 491–94, 760 A.2d 294 (2000); *Smith v. Pearre,* 96 Md.App. 376, 394, 625 A.2d 349 (1993) ("[I]f a patient is told by the doctor to return and fails to, then he may be charged with contributory negligence."); *Chudson v. Ratra,* 76 Md.App. 753, 548 A.2d 172 (1988). The observation by the Court of Appeals in *Menish v. Polinger Company,* 277 Md. 553, 561, 356 A.2d 233 (1976), is pertinent here:

> "[W]hen one who knows and appreciates, or in the exercise of ordinary care should know and appreciate, the existence of danger from which injury might reasonably be anticipated, he must exercise ordinary care to avoid such injury; when by his voluntary acts or omissions he exposes himself to danger of which he has actual or imputed knowledge, he may be guilty of contributory negligence."

See also *Moodie v. Santoni,* 292 Md. 582, 587, 441 A.2d 323 (1982).

It does not logically follow that a failure on Mr. Dehn's part to follow Dr. Mazella's instructions might have constituted negligence if he had had one reason for seeking the sterilization but might not have constituted negligence if he had had another reason for doing so. There is no cause-and-effect relationship between 1) Mr. Dehn's negligently contributing to his wife's impregnation and 2) whatever reason he may have had for wishing to avoid such a pregnancy. Whether the vasectomy was sought for the gravest of reasons, the silliest of reasons, or some reason in between, that original reason had no influence at all on Mr. Dehn's subsequent negligence. It

may have affected the consequences of the unwanted pregnancy, but it was irrelevant to the cause of the impregnation.

Indeed, if the duty of care that Mr. Dehn owed to himself to follow his specialist's instructions were a duty subject to fluctuation (it is not) lest he be deemed contributorily negligent, it would seem to follow that the more compelling the reason for the sterilization, the proportionately higher that duty of care and caution would become and the more strictly and punctiliously Mr. Dehn would be enjoined to follow his surgeon's medical advice to the very letter. A hypothetical victory by Mr. Dehn on this particular relevance issue, therefore, would have served only to exacerbate the degree of his contributory negligence. There is no way that that would have helped him.

### B. Dr. Edgecombe's Routines for Providing Referrals

The appellants' second evidentiary sub-issue is that Judge Hotten erroneously prevented them from developing evidence of Dr. Edgecombe's routine procedure with respect to referring patients to specialists in the first instance but then continuing to monitor their follow-up care himself. The single sustaining of a single objection, however, did not lay out the appellant's grand strategy as sweepingly as they now do in appellate brief. Another interpretation of the objectionable question is that the appellants were attempting an end-run around Judge Hotten's earlier ruling that they could not bring out evidence of Mr. Dehn's earlier medical history for peripheral artery disease.

In the course of the cross-examination of Dr. Edgecombe, counsel for the appellants began to question the doctor about a visit Mr. Dehn paid him on July 9, 1996. That was eight and one-half months after the vasectomy was performed and two and one-half months after the six-month post-operative period had run. The July 9, 1996, visit was for a final pre-operative examination for a surgery that was to be performed on Mr. Dehn the next day to increase his blood flow in alleviation of

his peripheral artery disease. The fragment of cross-examination in issue was:

Q. And this was, as you said, this was a meeting for prior to a surgical procedure; is that correct?

A. It was a medical problem that Mr. Dehn had.

Q. And this was to be—it was to be a surgery conducted by Dr. Grover the next day; is that correct, sir?

MR. FARLEY: Let me object, Your Honor.

At the ensuing bench conference, the appellants' attorney made his purpose clear.

I can tell you exactly where I'm going in the case. The Defendant says that I have referred him to a surgeon and he's following up with the surgeon for what the surgeon does. *In this case he gets the surgery on July 9 and ten months later he comes back to Dr. Edgecombe for a referral back to the surgeon for follow-up care.* That's the next question. Did he then see you about November for Dr. Grover for a referral for follow-up care.

(Emphasis supplied).

Judge Hotten sustained the objection to the line of questioning both on the basis of her earlier ruling and on the ground of lack of relevance. We hold that she was correct in both regards. Her earlier ruling that the prejudicial effect of knowledge of Mr. Dehn's peripheral artery condition would outweigh any probative value of the evidence was pertinent to this ruling as well. Our earlier analysis does not need repeating here. This ruling was consistent with the first.

Judge Hotten was also correct in ruling that the evidence was not relevant. The fact that Dr. Edgecombe on a single occasion, on July 9, 1996, referred Mr. Dehn to Dr. Grover for an operation to relieve peripheral artery disease and subsequently, "ten months later," referred Mr. Dehn to Dr. Grover again does not establish that Dr. Edgecombe had, in the interim, been in a doctor-patient relationship with Mr. Dehn with respect to the earlier operation or had assumed responsibility for monitoring Mr. Dehn's post-operative care. We have

no idea what the re-referral to Dr. Grover "ten months later" was for. Was it related to the July 1996 operation and, therefore, post-operative in nature? Was it for the purpose of a possible further operation? Was it for something else? We simply do not know. A fortiori, it does not establish on Dr. Edgecombe's part a habit, a pattern, or an invariable routine with respect to all referrals, to all specialists, with respect to all types of medical problems. Maryland Rule 5–406 was not remotely applicable.

A vasectomy is generally a one-time procedure. It is either successful or it is not. A urologist such as Dr. Mazella may, as in this case, assume full responsibility for the patient's post-operative checking on the operation's efficacy. Once the operation is determined to have been successful, everything is over and done with.

Peripheral artery disease, by contrast, is a continuing and degenerative process. Even temporary surgical relief would not suggest that, as the disease progresses, future referrals for further surgical relief would not be necessary. Without further belaboring the point, there are too many variables between the two situations to permit them to be treated as interchangeable parts of a single and invariable pattern or routine. For Judge Hotten to have failed to be convinced by the appellants' flawed logic[1] was hardly a clear abuse of discretion.

■ As we have narrowed our focus to contributory negligence, moreover, we would not find reversible error for yet a further reason. Even if, purely for the sake of argument, we were to assume that the questionable evidence proved that Dr. Edgecombe had a pattern, following a referral of a patient to a specialist for an operation, to remain in a doctor-patient relationship to monitor the patient's post-operative care, it would tell us nothing about Mr. Dehn's contributory negligence. It might, to be sure, help to establish Dr. Edge-

---

1. Arguing the existence of a pattern from an inadequate empirical predicate is referred to as the logical fallacy of *"secundum quid."*

combe's primary negligence, but Mr. Dehn, even without the benefit of the evidence of a routine, received a verdict in his favor on that issue.

The proffered evidence was that the re-referral by Dr. Edgecombe of Mr. Dehn to Dr. Grover, ten months after the July 9, 1996 operation for peripheral artery relief, alerted Mr. Dehn to the fact that Dr. Edgecombe generally assumed responsibility for Mr. Dehn's post-operative care following all referrals. The key date is ten months after July of 1996, to wit, May of 1997. To the extent to which it is suggested that Mr. Dehn's referral back to Dr. Grover in approximately May of 1997 somehow justified his earlier reliance on Dr. Edgecombe rather than on Dr. Mazella for his post-vasectomy responsibilities, the chronology does not follow. Mr. Dehn's multiple negligent failures to follow Dr. Mazella's explicit instructions were, as of May of 1997, long since *fait accompli*. Mrs. Dehn herself was already six months pregnant. Having been re-referred to Dr. Grover in May of 1997 had no conceivable impact on Mr. Dehn's contributory negligence throughout 1996.

We are not talking about the existence of a post-vasectomy doctor-patient relationship between Dr. Edgecombe and Mr. Dehn. Mr. Dehn himself testified as to that relationship. The jury necessarily found that there was such a relationship as the basis for its verdict of primary negligence. The jury's verdict of contributory negligence, on the other hand, held Mr. Dehn accountable for not following Dr. Mazella's instructions, notwithstanding anything that Dr. Edgecombe may have said. We are talking, therefore, only about the conceivable impact of the subsequent re-referral to Dr. Grover on Mr. Dehn's earlier contributorily negligent behavior. Self-evidently, there was none.

## C. Dr. Edgecombe's Skepticism About Mr. Dehn's Paternity

The third evidentiary sub-issue is demonstrably a non-starter. The appellants contend that Judge Hotten errone-

ously excluded evidence that would have shown that even after Mr. Dehn reported to Dr. Edgecombe that his wife was pregnant, 1) Dr. Edgecombe concluded that Mr. Dehn was not the father and communicated that doubt to Mr. Dehn, 2) Mr. Dehn was persuaded thereby also to doubt his paternity, 3) Mr. Dehn accused his wife of infidelity, and 4) the marital relationship was thereby badly damaged.

Mr. Dehn's contributory negligence in this case consisted of contributing to his wife's pregnancy. Whatever happened after she became pregnant cannot relate back so as to influence Mr. Dehn's pre-pregnancy negligence. His negligent behavior was already locked into history. Whatever may have happened afterward might have affected the calculation of damages, had there been any, but it clearly could have had no effect on contributory negligence. A later event cannot influence prior events. "The moving finger writes and, having writ, moves on."

Thus, as of this stage of our analysis, one prominent fact has been established that will have dispositive effect on the remaining contentions:

**AS UNASSAILABLY FOUND BY THE JURY, MR. DEHN, THE PRIMARY PLAINTIFF WAS GUILTY OF CONTRIBUTORY NEGLIGENCE AND WAS THEREBY BARRED FROM RECOVERING FROM DR. EDGECOMBE, NOTWITHSTANDING DR. EDGECOMBE'S PRIMARY NEGLIGENCE.**

## The Dismissal of the Negligence Count As to Mrs. Dehn

### A. The Claim Was One Charging Negligence

Mrs. Dehn contends that Judge Hotten erroneously dismissed her from the claim of negligence against Dr. Edgecombe at the end of the plaintiffs' case. What we are looking at is Count One of the Complaint. Mr. Dehn's claim of negligence under that count remained in the case and went to the jury. Our analysis of the propriety of Judge Hotten's ruling is only concerned with whether Mrs. Dehn had established, *prima facie*, some independent claim of her own

against Dr. Edgecombe for the tort of negligence. We agree with Judge Hotten that she had not.

■■■ At the outset, it is clear that Maryland, unlike some other states, has not established an independent cause of action for wrongful birth. Wrongful birth cases in Maryland are embraced within the tort of negligence. The subvariety of the tort in this case, successfully prosecuted by Mr. Dehn, was for the negligent failure to give proper post-vasectomy advice to avoid the risk of a failed vasectomy. That the cause of action under our microscope is for the tort of negligence is made clear by *Jones v. Malinowski,* 299 Md. 257, 263, 473 A.2d 429 (1984).

That there is *a cause of action in tort* based upon traditional medical malpractice principles *for negligence in the performance of a sterilization procedure* is well accepted. *See* Annot., *Tort Liability For Wrongfully Causing One To Be Born,* 83 A.L.R.3d 15 (1978). Maryland law is in accord. *See Sard v. Hardy,* 281 Md. 432, 379 A.2d 1014 (1977).

(Emphasis supplied).

■■■■ What follows from that premise that the action is one in tort is that, in the absence of some special statutory provision to the contrary, the ordinary rules of tort litigation apply. Once again, *Jones v. Malinowski* is instructive.

*In a tort action for negligence* in Maryland the plaintiff may recover "not only for the consequences which have actually and naturally resulted from the tort, but also for those which may certainly or reasonably and probably result therefrom as proximate consequences, but not for consequences which are speculative or conjectural." Otherwise stated, it is *the general rule of damages, applicable in tort actions in Maryland,* that a plaintiff may recover only those damages that are affirmatively proved with reasonable certainty to have resulted as the natural, proximate and direct effect of the tortious misconduct.

*These fundamental principles are manifestly applicable to a medical malpractice action in Maryland involving, as*

*here, a suit by parents for money damages from a physician for the negligent performance of a sterilization operation.*

299 Md. at 268–69, 473 A.2d 429 (emphasis supplied).

A clear statement that the standard rules and tests of negligence law apply to this relatively new species of negligence is found in Comment, "Judicial Limitations on Damages Recoverable for the Wrongful Birth of a Healthy Infant," 68 *Va. L.Rev.* 1311, 1331 (1982).

"As the popularity of family planning increases, the number of wrongful birth cases will grow. Until state legislatures provide statutory guidelines for assessing wrongful birth damages, *courts must rely on standard principles of negligence law. Only by treating wrongful birth as a negligently inflicted injury and analyzing it according to the principles accepted in other negligence actions can the court properly compensate the unwilling parents.*"

(Emphasis supplied).

## B. To Be Negligent, One Must First Owe a Duty

 The law, in Maryland as elsewhere, is well settled and long settled that a defendant cannot be guilty of negligence toward a plaintiff unless the defendant first owes some duty to that plaintiff. In *Grimes v. Kennedy Krieger,* 366 Md. 29, 85, 782 A.2d 807 (2001), this bedrock principle was squarely stated by Judge Cathell.

*In order to establish a claim for negligence under Maryland law, a party must prove four elements: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3)* that the plaintiff suffered actual injury or loss and (4) that the loss or injury proximately resulted from the defendant's breach of the duty."

(Emphasis supplied).

*Grimes v. Kennedy Krieger,* 366 Md. at 85–86, 782 A.2d 807, quoted with approval from *West Virginia Central Railroad Co. v. Fuller,* 96 Md. 652, 666, 54 A. 669 (1903).

"*[T]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another.* It is consequently relative and *can have no existence apart from some duty* expressly or impliedly imposed. In every instance *before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining,* the observance of which duty would have averted or avoided the injury.... As the duty owed varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and *the act complained of never amounts to negligence* in law or in fact; *if there has been no breach of duty.*"

(Emphasis supplied).

In *Brown v. Dermer,* 357 Md. 344, 356, 744 A.2d 47 (2000), Chief Judge Bell reaffirmed that negligence "necessarily involves the breach of some duty owed by a defendant to the plaintiff." See also *Valentine v. On Target,* 353 Md. 544, 550–53, 727 A.2d 947 (1999); *Hartford Insurance Co. v. Manor Inn of Bethesda, Inc.,* 335 Md. 135, 148, 642 A.2d 219 (1994); *Ashburn v. Anne Arundel County,* 306 Md. 617, 626–27, 510 A.2d 1078 (1986).

## C. The Doctor–Patient Relationship as the Primary Source of the Duty

Our inquiry, therefore, becomes one of whether Dr. Edgecombe owed a duty of care to Mrs. Dehn. With respect to claims of medical malpractice specifically, the duty of care generally arises out of an actual doctor-patient relationship. In *Dingle v. Belin,* 358 Md. 354, 367, 749 A.2d 157 (2000), Judge Wilner pointed to such a relationship as the *sine qua none* of a successful recovery.

We have long recognized, as have most courts, that, except in those unusual circumstances when a doctor acts gratuitously or in an emergency situation, *recovery for malpractice "is allowed only where there is a relationship of doctor and patient* as a result of a contract, express or

implied, that the doctor will treat the patient with proper professional skill and the patient will pay for such treatment, and there has been a breach of professional duty to the patient."

(Emphasis supplied). See also *Hoover v. Williamson*, 236 Md. 250, 253, 203 A.2d 861 (1964). In *Miller v. Schaefer*, 80 Md.App. 60, 73, 559 A.2d 813 (1989), Judge Karwacki wrote for this Court:

> *Before a physician may be found liable for an act of medical malpractice, it is essential that a patient-physician relationship be in existence at the time the alleged act occurred.* Establishment of this relationship must generally be a result of mutual consent.

(Emphasis supplied). In *Sterling v. Johns Hopkins Hospital*, 145 Md.App. 161, 169, 802 A.2d 440 (2002), Judge Thieme similarly stated:

> *The duty of care owed to an individual in the medical context is based primarily on the existence of the physician-patient relationship.*

(Emphasis supplied).

In *Lemon v. Stewart*, 111 Md.App. 511, 521, 682 A.2d 1177 (1996), Chief Judge Wilner stated for this Court:

> *The common law duty of care* owed by a health care provider to diagnose, evaluate, and treat its patient ordinarily *flows only to the patient, not to third parties.* Thus, it has often been said that a malpractice action lies only where a health care provider-patient relationship exists and there has been a breach of a professional duty owing to the patient.

(Emphasis supplied). In the *Lemon v. Stewart* case, we held that the health care provider owed no duty to family members with whom the patient lived to inform them that the patient was HIV-positive. In *Homer v. Long*, 90 Md.App. 1, 11, 599 A.2d 1193 (1992), this Court also held:

> *[A] therapist's professional duty must run to his or her patient and not to the patient's spouse,* even if, as here, the

spouse is the one who initially employed the therapist and is paying the therapist's fees.

(Emphasis supplied).

### D. No Doctor–Patient Relationship Between Dr. Edgecombe and Mrs. Dehn

██ There was no direct doctor-patient relationship between Dr. Edgecombe and Mrs. Dehn. The two of them had never met or spoken to each other until the day of trial. Dr. Edgecombe was Mr. Dehn's primary health care provider, not Mrs. Dehn's. Mr. Dehn, not Mrs. Dehn, was in the health care program that involved Dr. Edgecombe. The evidence was, moreover, that on the three post-vasectomy occasions when Dr. Edgecombe was allegedly negligent, Mr. Dehn was not even visiting him to discuss post-operative care relating to the vasectomy but was visiting him, without Mrs. Dehn, for other and unrelated medical purposes. If a duty of care owed by Dr. Edgecombe to Mrs. Dehn is to be found, therefore, its source must be somewhere other than in a doctor-patient relationship *per se* between the two of them.

Mrs. Dehn cites *Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014 (1977), as authority for her contention that not only the primary plaintiff but also the primary plaintiff's spouse are proper parties to bring a negligence suit against a doctor for a wrongful birth suffered by the couple. Although both the wife, who was to undergo a sterilization procedure, and her husband were, coincidentally, parties to the suit, *Sard v. Hardy* had no occasion to decide or even to discuss who were proper party-plaintiffs in such an action or, assuming *arguendo* that the patient's spouse also had a claim, whether such claim would be direct or derivative in nature. *Sard v. Hardy* focused exclusively on a physician's duty to obtain, by providing sufficient information, the informed consent of the primary plaintiff, to wit, the wife, who was his patient.

Mrs. Dehn's apparent total lack of involvement with Dr. Edgecombe in this case, moreover, contrasts sharply with the mutual involvement with the doctor by both husband and wife, the joint plaintiffs in *Sard v. Hardy*. The Court of Appeals,

281 Md. at 434, 379 A.2d 1014, characterized the issue there before it as one of whether the evidence was legally sufficient to support a verdict that "Dr. Hardy ... was negligent in failing *to advise the Sards* that a tubal ligation ... might not succeed." *"[T]he Sards alleged* that the appellee negligently failed to advise *them* ..." 281 Md. at 435, 379 A.2d 1014. *"Mrs. Sard's husband testified* that appellee never mentioned the possibility of vasectomy." 281 Md. at 436, 379 A.2d 1014. "It is undisputed that appellee never informed *appellants* of the various methods of performing a tubal ligation." *Id.* "Previously, *Mr. Sard ... had signed the same [advised consent] form."* 281 Md. at 438, 379 A.2d 1014. "[B]y signing the consent form, *they* acknowledged *their* understanding that the sterilization procedure was not effective in all cases." *Id.* "Finally, there was evidence permitting the jury to find that Dr. Hardy did not discuss the possibility of vasectomy with *either appellant,* even though ... it was customary for physicians to discuss this subject when consulted by patients about sterilization." 281 Md. at 446, 379 A.2d 1014. "There was *testimony by both appellants* to the effect *that they were assured by appellee* ... that Mrs. Sard was absolutely sterile." 281 Md. at 452 n. 6, 379 A.2d 1014.

The significant involvement of the patient's spouse with the doctor in *Sard v. Hardy* differed diametrically from the total lack of any contact between Mrs. Dehn and Dr. Edgecombe in this case. The only thing that Mrs. Dehn in this case had in common with Mr. Sard in that case is that they were spouses of the primary plaintiffs who were the actual patients. Beyond that, all similarity ceases. The husband in *Sard v. Hardy* at least had some relationship with the doctor. Mrs. Dehn in this case had none.

Count One of the Complaint itself, the only count that is in issue, indeed, did not even allege that any relationship existed between Dr. Edgecombe and Mrs. Dehn. See *Scott v. Jenkins,* 345 Md. 21, 28–29, 690 A.2d 1000 (1997). Its key allegations were:

45. *Mr. Dehn sought care and treatment from Dr. Edgecombe.*

46. *Dr. Edgecombe owed a duty to Mr. Dehn* to exercise reasonable medical care and to meet the minimally acceptable standards of care in the medical community *treating Mr. Dehn.*

47. *In breach of his duty to Mr. Dehn, Dr. Edgecombe negligently failed to provide Mr. Dehn* with the minimally acceptable level of medical care, in unreasonably refusing to provide a referral for a sperm count after the performance of a vasectomy despite the requests of Mr. Dehn.

48. As a direct and proximate cause of Dr. Edgecombe's unreasonable refusal of the referral for a sperm count coupled with his repeated assurances that vasectomies do not fail, and without any contributory negligence on the part of Mr. Dehn, Mr. Dehn fathered a fourth child[2] subsequent to undergoing a vasectomy and despite his intentions to limit his family size due to his health problems and financial and other considerations.

49. *The damages of Plaintiff James Dehn* include the cost of raising his fourth child to adulthood, and the emotional strain and damage to his marriage as a direct and proximate result of Dr. Edgecombe's actions which fell below the acceptable standard of care.

(Emphasis supplied).

Not only did the Negligence Count fail to allege any duty of care owed by Dr. Edgecombe to Mrs. Dehn, it also failed to allege any damages expressly suffered by her. If it were necessary to rely on the inadequacy of the allegations, the flawed pleading alone could be fatal to Mrs. Dehn's claim.

## E. The Cryptic Silence of *Jones v. Malinowski*

▇▇▇ In arguing for an independent cause of action in her own right, Mrs. Dehn relies almost exclusively on the purported stealth holding of *Jones v. Malinowski,* 299 Md. 257, 473

---

2. One of the couple's previous three children was a child of Mr. Dehn's from a former marriage.

A.2d 429 (1984). She relies, elusively, on things that *Jones v. Malinowski* did not say, but which the court must, she alleges, have been thinking *sub silentio*. Such a divining of meaning is hard to pin down and hard to confute.

Another way of saying, of course, that an appellate opinion implies something *sub silentio* is to say that the opinion is silent on the subject. That latter characterization would be far more in keeping with sound principles of *stare decisis.* *Sub silentio* arguments are nonetheless an interesting, albeit a rogue and aberrant, branch of legal methodology.

The founding myth of the *sub silentio* school of jurisprudence is that, in reviewing a lengthy trial involving numerous procedural phenomena, everything that the appellate court does not expressly condemn, it has implicitly approved. That, of course, is a juridical delusion. Possibly questionable procedures that are not challenged are neither approved nor disapproved by a reviewing court. They may have been 1) inadvertently overlooked, 2) consciously ignored, 3) strategically saved for consideration on a later day, or 4) made the subject of *arguendo* assumptions. More to the point, they most often are, in the context of that particular appeal, none of the appellate court's business. Silence not only does not speak volumes, it does not speak at all.

The apostles of *sub silentio* argument, however, ascribe to appellate courts a combination of omniscience and Herculean energy that is, as anyone familiar with the process poignantly knows, pure fantasy. Appellate judges are not knights errant adventuring forth to slay legal error wherever it may lurk. They decide, rather, those limited issues that the appellate litigation process has squarely framed for decision and then, happily, adjourn for the day. Many appeals that raise an issue or two for necessary decision could, of course, potentially raise other issues as well, but, for whatever reason, they do not. Accordingly, the courts that hear those appeals do not, with rare exceptions, reach out to decide things they are not

called upon to decide.[3]

When an appellate court, moreover, decides an issue, particularly for the first time, the precedential value or weight of its opinion depends upon 1) the thoroughness and the accuracy of the legal research that went into it, 2) the cogency of the legal reasoning that produced it, and 3) the linguistic clarity and facility with which it is expressed. An allegedly *sub silentio* decision, however, 1) gives evidence of no legal research, 2) engages in no legal reasoning, and 3) expresses nothing. In any sane universe of critical appraisal, it is self-evidently worthless.

Such is the fate of Mrs. Dehn's reliance on *Jones v. Malinowski*. The issue now before us calls upon us to distinguish between 1) the entitlement to bring a malpractice suit on the part of a primary plaintiff, who had been in a doctor-patient relationship with the defendant; and 2) the entitlement to sue on the part of the primary plaintiff's spouse, who was not in a doctor-patient relationship but who may have suffered injury because of the defendant's negligence. We are addressing whether the spouse has a claim independent of the primary plaintiff's claim. We are addressing whether the contributory negligence or other foreclosing fault on the part of the primary plaintiff could compromise a merely derivative claim by the spouse.

No such issue, of course, was remotely before the Court of Appeals in *Jones v. Malinowski*. Assuming, without deciding, a proper verdict of primary negligence and assuming, without deciding, that both plaintiffs were proper parties, the Court of Appeals had as the exclusive question before it the question of whether the expense of raising a child was a factor that could enter into the calculation of damages.

---

**3.** To be sure, courts sometimes refer, with studied ambiguity, to what might be taken to have been its own earlier *sub silentio* decisions in an effort to fabricate a precedential pedigree where none actually exists. It may be a case of an institution's being unable to resist the myth of its own prescience.

*We granted certiorari to consider a single issue of* first impression in this State raised in the joint petition of the parties, namely: "Where a negligently performed sterilization resulted in the birth of a healthy child, *did the trial court err in its charge that the jury could award damages for the expense of raising the unplanned child* during minority reduced by value of the benefits conferred upon the parents by having the child?"

299 Md. at 259, 473 A.2d 429 (emphasis supplied). Nothing else was before the Court of Appeals for decision. Accordingly, nothing else was decided.

In *Jones v. Malinowski*, to be sure, there were two plaintiffs, husband and wife. The wife suffered a flawed sterilization operation. The husband was indirectly involved as her spouse. In *Jones v. Malinowski*, however, the claim of neither plaintiff was, as here, dismissed from the suit. There was, moreover, no verdict, as in this case, of contributory negligence against one of the plaintiffs. There was, therefore, no issue in *Jones v. Malinowski* that involved any difference in the litigational postures of the respective plaintiffs. Their only role in that case was as an entity. It made no difference to the outcome of that case whether there was one proper plaintiff or two. Consequently, the Court did not pay any attention to what was, in that context, a non-issue.

Most assuredly, *Jones v. Malinowski* did not hold, as Mrs. Dehn now maintains, that in a suit for wrongful birth based on a doctor's negligence each parent has an independent right to sue the defendant-doctor regardless of whether that parent had ever been in a doctor-patient relationship with the defendant or not. If there was a duty of care owed by Dr. Edgecombe to Mrs. Dehn, its source must be sought by some modality other than attempting to read between the lines of *Jones v. Malinowski*. The only significance of the silence of *Jones v. Malinowski* is that although it did not affirm the existence of an extended duty of care to the patient's spouse, neither did it deny it. For the purposes of our present analysis, the question remained open.

## F. Mrs. Dehn May Have Had a Derivative Claim

To say that Mrs. Dehn did not have a cognizable claim based on the authority of *Jones v. Malinowski,* however, is not to say that Mrs. Dehn did not have a claim. She may well have had a claim, although it is unnecessary for us to decide that because of the foreclosing jury verdict of contributory negligence in this case.

We note, however, the strong likelihood that there well may be in negligence cases involving wrongful birth or wrongful pregnancy an extended duty of care, proceeding from the doctor derivatively through the patient to the patient's spouse. The extension, however, is a two-step process. The duty does not reach from A to C except through B.

Although general tort principles ordinarily limit the entitlement to bring a claim for medical malpractice to one who was in an actual doctor-patient relationship with the doctor or other health care provider, in exceptional circumstances a derivative right to make a claim for damages has been recognized for a limited and tightly circumscribed class of persons, to wit, some of those who are sought to be protected by the medical procedure being undertaken. In cases of wrongful birth or wrongful pregnancy, the spouse of the primary plaintiff may enjoy such derivative protection, to wit, an extended duty of care. Although Maryland has not yet spoken on this extension of the duty of care, *Restatement (Second) of Torts,* § 324A, has spoken.

> "*One who undertakes,* gratuitously or for consideration, *to render services to another* which he should recognize as *necessary for the protection of a third person* . . . *is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care* . . . if . . ."

> "(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

(Emphasis supplied).

In several landmark cases, New York has recognized this extended reach of the duty of care. *Cohen v. Cabrini Medical Center,* 730 N.E.2d 949, 94 N.Y.2d 639, 709 N.Y.S.2d 151

(2000), was a case in which a doctor was guilty of malpractice in performing surgery on a husband in an effort to increase his fertility. As a result of the doctor's negligence, the husband's fertility was actually diminished. In that case the Court of Appeals of New York refused to entertain a claim for damages by the wife because of her diminished chance of getting pregnant, because of the absence of any doctor-patient relationship embracing her.

The courts below properly held that *plaintiff cannot recover because Amelar was under no legal duty of care to her* to prevent those injuries.

No duty can be imposed here on the basis of a doctor-patient relationship between plaintiff and Amelar. While plaintiff did participate in her husband's consultation with the doctor, no treatment or care of plaintiff was ever contemplated. *Although in limited circumstances a physician's duty of care has been extended to a patient's family members, our courts have been especially circumspect in doing so.*

709 N.Y.S.2d 151, 730 N.E.2d at 951 (emphasis supplied).

Even while insisting that it was "especially circumspect" about extending "a physician's duty of care ... to a patient's family members," the Court of Appeals nonetheless referred to certain compelling circumstances in which it had done so.

On the other hand, in *Tenuto* [*v. Lederle Labs.*, 90 N.Y.2d 606, 612, 687 N.E.2d 1300] we posited a pediatrician's duty of care extending to the parent of an infant vaccinated for paralytic poliomyelitis. Allegedly because of the physician's failure to warn or advise the parent to take precautions against "contact" polio, which results from contact with the feces or saliva of one who had received this specific form of polio vaccine, the parent became infected with the disease and was rendered a paraplegic. *The parent's averments* in *Tenuto were sufficient to establish a special relationship connecting physician, child and parent, and the resultant duty of care* to the parent. The critical factors we identified in extending the duty included (1) the parent had engaged

the physician and relied exclusively on his professional advice, (2) it was the physician's acts in administering the vaccination to the infant that created the serious risk of physical harm to the parent and (3) the physician knew or should have known that the failure to warn the parent of the serious peril heightened the risk.

709 N.Y.S.2d 151, 730 N.E.2d at 951 (emphasis supplied).

The Court of Appeals further pointed out that in cases of a negligently performed vasectomy, the duty of care extended derivatively to the patient's spouse as well as to the patient himself.

> The *lower courts have also extended physician liability to the wife of a patient for her* physical injuries due to an *unwanted pregnancy after a negligently performed vasectomy.* [T]he procedure was undertaken specifically and expressly to prevent the wife's pregnancy and consequential physical harm; both patient and wife relied upon proper performance; and the physical harm from the pregnancy was the direct outcome of the physician's malpractice. *Imposing a duty and liability for its breach in favor of the wife of the patient in those cases fell comfortably within established tort principles.*

709 N.Y.S.2d 151, 730 N.E.2d at 951–52 (emphasis supplied).

In terms of extending the duty of care to the spouse of the primary patient in cases of wrongful birth or wrongful pregnancy, the prototype case in New York was that of *Miller v. Rivard,* 585 N.Y.S.2d 523, 180 A.D.2d 331 (1992). As a result of the defendant-doctor's negligence, the husband had suffered an unsuccessful vasectomy. At issue was the right of the wife to recover for her damages. The Appellate Division held that the spouse of the primary plaintiff had the right to recover for derivative damages.

> *[D]efendants argue that the absence of a doctor-patient relationship between Rivard and Mrs. Miller precludes the existence of any duty directly to her* which may have been breached by malpractice committed upon her husband. Therefore, according to defendants, to permit her to recover

against her husband's doctors for her own personal injuries and pecuniary losses arising from this wrongful conception, no matter how foreseeable, would be an unwarranted, unmanageable extension of traditional tort principles. We disagree. First, *recognition of an independent right of recovery for Mrs. Miller's own injuries from wrongful conception due to an unsuccessful vasectomy performed on her husband is fully supported by precedent.* In this State, two other Departments have explicitly recognized a cause of action on behalf of the wife of a vasectomy patient against the physician who performed the procedure, for her pain and suffering and emotional distress resulting from the pregnancy and delivery of the child. *[E]ach spouse is entitled to recover as damages his or her own physical, emotional and pecuniary loss from a wrongful conception, irrespective of which spouse was the actual recipient of the negligently performed sterilization,* fertility testing or test result reporting.

585 N.Y.S.2d at 526 (emphasis supplied).

The Appellate Division explained why this extension of the duty of care to a spouse does not offend traditional tort principles.

In our view, *imposing liability on Mr. Miller's physicians for Mrs. Miller's claim, despite the lack of a doctor-patient relationship between them, also falls well within traditional tort principles.* According to plaintiffs' submissions, it was not merely foreseeable that Mrs. Miller might suffer serious injuries in the event of becoming pregnant as a result of any negligent performance of her husband's vasectomy or fertility testing. As Rivard was made aware, *avoidance of a potentially injurious fourth pregnancy for Mrs. Miller was the essential purpose of Mr. Miller's undergoing the entire sterilization procedure. Such awareness is sufficient,* under long-standing tort doctrine, *to subject Rivard to liability for Mrs. Miller's injuries* resulting from his negligent performance of the procedures she relied upon, *despite the lack of any direct doctor-patient relationship between them.*

585 N.Y.S.2d at 527 (emphasis supplied). See also *Sorkin v. Lee,* 434 N.Y.S.2d 300, 303, 78 A.D.2d 180, 184 (1980). Cf. *Glanzer v. Shepard,* 135 N.E. 275, 233 N.Y. 236 (1922); *Ultramares Corp. v. Touche,* 174 N.E. 441, 255 N.Y. 170 (1931).

Dr. Edgecombe was in a doctor-patient relationship with Mr. Dehn and consequently owed a duty of care to Mr. Dehn. Because Mr. Dehn's desire to be sterilized was for the obvious purpose of protecting both himself and his wife from the burdens of an undesired pregnancy and an unwanted child, it is quite possible that Dr. Edgecombe's duty of care extended derivatively through Mr. Dehn to embrace Mrs. Dehn as well.

Assuming, *arguendo,* that such an extension of the duty of care took place, it is nonetheless clear that it was Dr. Edgecombe's primary duty to Mr. Dehn in the first instance through which the derivative duty to Mrs. Dehn necessarily proceeded. We repeat that the duty does not reach from A to C except through B. Indeed, *Miller v. Rivard,* 585 N.Y.S.2d at 527, referred to such a duty to "the legal spouse ... of the person directly acted upon" as a "derivative" duty.

> Restricting recovery of tort claimants to the legal spouse or family of the person directly acted upon is *not an uncommon method of limiting the scope of liability to a manageable, predictable class, as applied,* for example, *to derivative claims.*

(Emphasis supplied).

Again assuming without deciding that Maryland would follow New York's lead in extending the duty of care in a case such as this to the spouse of the patient, it still remains to explore what the legal consequences would be of such a claim's being only derivative in nature. If the verdict of contributory negligence on the part of Mr. Dehn would in any event foreclose any recovery by Mrs. Dehn on a derivative claim, it would become unnecessary to determine what the pleading requirements would be in order properly to allege such a derivative claim. That would moot any consideration by us of Judge Hotten's dismissal, if such it was, of Mrs. Dehn from

Count One charging Dr. Edgecombe with negligence against Mr. Dehn. It would hardly have been a dismissal if she had never been made a party to that count in the first instance.

### The Fate of the Derivative Claim, If, *Arguendo,* There Was One

It is the dispositive fact of Mr. Dehn's contributory negligence that makes it unnecessary for us to decide whether Mrs. Dehn would have had, but for that contributory negligence, a derivative claim against Dr. Edgecombe. Even assuming, *arguendo,* that she had such a derivative claim, it would have been barred by the contributory negligence of the primary plaintiff.

The fate of a derivative claim is controlled by the fate of the primary claim. Dan B. Dobbs, I *The Law of Torts* (2001), § 199, "Traditional Rules of Contributory Negligence," p. 494, points out:

> The traditional rule held that *contributory negligence of a plaintiff, or the person from whom the plaintiff derived her claim, was a complete bar to the claim.* Contributory negligence was an affirmative defense, so the defendant had the burden of proof on that issue, but once proved, *the plaintiff's causal contributory negligence immunized the negligent defendant.*

(Emphasis supplied).

The Annotation, "Contributory Negligence of Spouse or Child as Bar to Recovery of Collateral Damages Suffered by Other Spouse or Parent," 21 A.L.R.3d 469, 471 (1968), similarly states the law:

> All cases from American jurisdictions are unanimous in holding that *the contributory negligence of a spouse bars a recovery of collateral damages suffered by the other spouse.* As a basis for this holding the courts frequently advance the theory that *the action for collateral damages is derivative in nature and dependent upon the right of the injured spouse to recover,* and is therefore subject to the same

defenses that are available in an action arising in favor of the injured spouse.

(Emphasis supplied).

The *Restatement of Torts 2d* (1965), § 693, "Action by One Spouse for Harm Caused by Tort Against Other Spouse," Comment e, p. 497, also states:

> *In order to subject a defendant to liability to a deprived spouse for illness or bodily harm done to the impaired spouse, all of the elements of a tort action in the impaired spouse must exist, including* the tortious conduct of the tortfeasor, the resulting harm to the impaired spouse and *the latter's freedom from such fault as would bar a recovery by him or her, as for example, contributory negligence.*

(Emphasis supplied).

## A. By Analogy: Loss of Consortium Claims

■ In *Deems v. Western Maryland Railway Company,* 247 Md. 95, 231 A.2d 514 (1967), the Court of Appeals explained why, in a suit for loss of consortium, the claims of husband and wife are so interdependent as to require that they be combined in a joint action.

> That both spouses suffer when the marriage relationship is adversely affected by physical injury to either is a fact evidenced, if not by logic, by human experience since the institution of marriage became a basic part of our mores.

> It is because these marital interests are in reality so interdependent, because injury to these interests is so essentially incapable of separate evaluation as to the husband and wife, that the conception of the joint action seems to us a fair and practical juridical development.

247 Md. at 108–09, 231 A.2d 514. Accordingly, the Court of Appeals, 247 Md. at 115, 231 A.2d 514, held that

> when either husband or wife claims loss of consortium by reason of physical injuries sustained by the other as the result of the alleged negligence on the defendant, *that claim can only be asserted in a joint action for injury to the marital relationship. That action is to be tried at the same*

*time as the individual action of the physically injured spouse.*

(Emphasis supplied).

Pursuant to that holding, it became clear the wife's claim is not independent but is vulnerable to whatever defenses could be asserted to the husband's suit for negligence in the first instance. In *Deems,* the husband had settled his claim for physical injury and that barred a separate action by the wife for any derivative claim.

> Because of this limitation upon the application of our holding, the appellant in this case cannot prevail. She waited until after her husband's case for physical injuries had been settled before she instituted her action for loss of consortium.

247 Md. at 115, 231 A.2d 514.

The Annotation in 25 A.L.R.4th 118, 121, "Negligence of Spouse or Child as Barring or Reducing Recovery for Loss of Consortium by Other Spouse or Parent," (1983), speaks to the same effect.

> The courts in the following cases held that *where a spouse* or parent *sues for loss of consortium as a result of physical injuries to a spouse* or child, *the contributory negligence of the physically injured spouse* or child in causing his or her own personal injuries *will bar* or reduce *consortium damages* on the reasoning that *a suit for loss of consortium is a derivative action with the result that a defense which will bar or reduce recovery for the personal injuries inflicted on one family member will also bar or reduce recovery for loss of consortium by another family member.*

(Emphasis supplied).

## B. By Analogy: Wrongful Death Claims

The recent decision of this Court in *McQuay v. Schertle,* 126 Md.App. 556, 730 A.2d 714 (1999), also strongly suggests that Mr. Dehn's contributory negligence was fatal to whatever derivative claim Mrs. Dehn might arguably have been able to assert. *McQuay v. Schertle* was, *inter alia,* a wrongful death

action brought by the decedent's four minor children for the wrongful death of their mother caused by the negligence of the defendant. The decedent-mother, however, was also found by the jury to have been contributorily negligent.

Although we remanded the case for a rehearing on contributory negligence because of several faulty jury instructions, the import of our opinion was that if the decedent had, indeed, been contributorily negligent, the right of her children to recover for her wrongful death would for that reason have been barred. See also *Kassama v. Magat*, 136 Md.App. 637, 656–59, 767 A.2d 348 (2001) (in a suit for wrongful birth, the contributory negligence of the patient-mother would fatally compromise any derivative claim by the child), *aff'd*, 368 Md. 113, 792 A.2d 1102 (2002).

*Moodie v. Santoni*, 292 Md. 582, 441 A.2d 323 (1982), and, on remand, *Santoni v. Moodie*, 53 Md.App. 129, 452 A.2d 1223 (1982), was a wrongful death action in which the possible contributory negligence of the decedent husband was controlling on the right of his surviving wife to recover for the negligence that had caused his death.

The jury found the appellees were negligent and that their negligence caused or contributed to Mr. Santoni's death, *but the jury also found that Mr. Santoni himself was contributorily negligent. Recovery thereby was effectively denied the appellant.*

53 Md.App. at 130, 452 A.2d 1223 (emphasis supplied).

The Maryland cases have invariably held that the contributory negligence of the decedent would defeat any wrongful death actions brought by survivors of the deceased. *Frazee v. Baltimore Gas & Electric Co.*, 255 Md. 627, 258 A.2d 425 (1969); *State, Use of Brandau v. Brandau*, 176 Md. 584, 6 A.2d 233 (1939); *State, Use of Potter v. Longeley*, 161 Md. 563, 570, 158 A. 6 (1932); *North Central Ry. Co. v. State, Use of Burns*, 54 Md. 113 (1880); *State, Use of Foy v. Philadelphia, Wilm. & Balto. R.R.*, 47 Md. 76 (1877). A suit for wrongful death was similarly barred in a case in which it was determined that the decedent had been guilty of the assumption of

the risk. *Baltimore & Potomac R.R. v. State, Use of Abbott,* 75 Md. 152, 23 A. 310 (1892). See also *Burke v. United States,* 605 F.Supp. 981, 988 (D.C.Md.1985):

> The Maryland law appears to be that *if a decedent could not have brought a cause of action* for injury at the time of death, *the wrongful death action similarly is precluded.*

(Emphasis supplied).

Dan B. Dobbs, *The Law of Torts* (2001), § 299, "Contributory Negligence and Similar Defenses," pp. 815–16, speaks to the same effect:

> Wrongful death statutes create a new cause of action for the benefit of survivors; it is not merely a continuance of the deceased's own claim. At the same time they provide or have been interpreted to mean that *no new cause of action is created unless the deceased himself would have been able to sue had he lived.* The effect in most instances is that *a defense that would have defeated the deceased's claim had he lived will also defeat the wrongful death suit.* Consequently, *contributory negligence of the deceased was a bar to the wrongful death action whenever it would have barred the deceased's own claim had he lived.*

(Emphasis supplied).

The *Restatement of Torts 2d* (1965), § 494, p. 554, also states:

> *The plaintiff is barred from recovery* for an invasion of his legally protected interest in the health or life of a third person which results from the harm or death of such third person, *if the negligence of such third person would have barred his own recovery.*

(Emphasis supplied).

In *Smith v. Gross,* 319 Md. 138, 144, 571 A.2d 1219 (1990), Judge Orth stated the general rule that any act that would have barred recovery by the decedent, had he lived, will defeat a derivative claim either 1) by the personal representative in a survival action or 2) by the relatives in a wrongful death

action, notwithstanding his observation that wrongful death actions "are not as purely derivative as survival actions."

The general rule is that *defenses which would have been good against the decedent,* had the decedent survived, *are good against* the decedent's personal representatives and, in their capacity as Lord Campbell's Act claimants, *the decedent's survivors.* As to survival actions, *see* 4 Harper, James & Gray, *The Law of Torts,* § 23.8 at 449 (2d ed. 1986) ("Where the statute provides for the survival of [the decedent's] action, the surviving action is derivative in the fullest sense of the term, and the result of the cases [*i.e.,* contributory negligence of decedent bars estate's action] comes as near to being demanded by inexorable logic as anything does"). *Actions under Maryland's Lord Campbell's Act, however, are not as purely derivative as survival actions.*

(Emphasis supplied).

Even so, a wrongful death action by the mother for the death of her two-year-old son caused by the negligence of the unwed father was barred because a suit by the son, had he survived, would have been barred by parent-child immunity.

In this case *[the parent-child immunity] serves to bar an action by the child while living* against the father. *Therefore, the mother is precluded from proceeding* against the father *in her own right* as a parent or as the personal representative of the child's estate.

319 Md. at 149, 571 A.2d 1219 (emphasis supplied).

## C. Mrs. Dehn's Derivative Claim, If It Existed, Did Not Survive Mr. Dehn's Contributory Negligence

In a wrongful birth case charging a doctor or other health care provider with having negligently caused an unwanted birth of a child, the spouse who was in the doctor-patient relationship (in this case, Mr. Dehn) is the primary plaintiff. To the extent to which the other spouse may also have a claim for damages, that claim is derivative in nature and must be brought in a joint action and tried along with the

trial of the primary plaintiff's suit for negligence. To the extent to which contributory negligence or any other foreclosing reason would bar recovery by the primary plaintiff, any derivative claim by the spouse is, *ipso facto*, also barred.

Mrs. Dehn's claim for damages against Dr. Edgecombe, if it existed, was only derivative, through her husband-wife relationship with the primary plaintiff. The verdict of contributory negligence against Mr. Dehn, barring any recovery by him, thereby also barred any derivative claim that Mrs. Dehn arguably possessed.

### Evidence of Damages

Our holding that the verdict of contributory negligence on the part of Mr. Dehn necessarily bars any recovery by either appellant against Dr. Edgecombe makes any issue with respect to the proof of damages self-evidently moot.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**